RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

MANUEL ANTONIO SOTO (13-2300); HECTOR SANTANA (13-2389); CHRISTOPHER ESPINOZA (13-2510); JUAN RAMON RESPARDO-RAMIREZ (13-2582);

        *Defendants-Appellants.*

Nos. 13-2300/2389/2510/ 2582

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cr-20635-15—David M. Lawson, District Judge.

Argued: November 19, 2014

Decided and Filed: July 24, 2015

Before: NORRIS, MOORE, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark J. Kriger, LARENE & KRIGER P.L.C., Detroit, Michigan, for Appellant in 13-2300. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 13-2389. Joseph A. Niskar, Royal Oak, Michigan, for Appellant in 13-2510. Sanford A. Schulman, Detroit, Michigan, for Appellant in 13-2582. Mark Chasteen, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Mark J. Kriger, N. C. Deday LaRene, LARENE & KRIGER P.L.C., Detroit, Michigan, for Appellant in 13-2300. Zenaida R. Lockard, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 13-2389. Joseph A. Niskar, Royal Oak, Michigan, for Appellant in 13-2510. Sanford A. Schulman, Detroit, Michigan, for Appellant in 13-2582. Mark Chasteen, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

1

_____

**AMENDED OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.   This case involves the drug-trafficking, kidnapping, and firearms convictions of Defendants-Appellants Hector Santana, Manuel Antonio Soto, Christopher Espinoza, and Juan Ramon Respardo-Ramirez.  A grand jury indicted them on two conspiracies and two firearms charges:  conspiracy to possess cocaine with the intent to distribute and to distribute it, 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii)(II) (2012) (Count 1); conspiracy to kidnap, 18 U.S.C. § 1201(a)(1)(c) (Count 5); possession of a firearm in furtherance of and during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c) (2012) (Count 7); and possession of a firearm in furtherance of and during and in relation to a crime of violence, 18 U.S.C. § 924(c) (Count 8).  The indictment permitted the government to try the appellants as aiders and abettors for Counts 7 and 8.  In addition, the grand jury indicted Santana, Soto, and Espinoza as principals and as aiders and abettors for possession of 500 or more grams of cocaine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(ii)(II) (2012), 18 U.S.C. § 2 (2012) (Count 2).  Count 6 charged all four with kidnapping as principals and as aiders and abettors in violation of 18 U.S.C. §§ 1201, 2.  The grand jury indicted only Soto for obstruction of justice in violation of 18 U.S.C. § 1512(b)(1)–(2)(A) (Count 9).

At the conclusion of a trial, a jury convicted the defendants-appellants on all counts with two exceptions:  the jury acquitted Espinoza of Count 1, conspiracy to distribute cocaine, and Respardo-Ramirez of Count 5, conspiracy to kidnap.  The four defendants appeal their convictions, and Soto and Santana also appeal their sentences.  For the reasons set forth in this opinion, we **AFFIRM** the judgments.

## I.  BACKGROUND

### A.  Evidence at Trial

At trial, in addition to various law-enforcement officers, three witnesses who had originally been charged as co-conspirators testified:  Erik Freeman, Vanessa Gudino, and Jose

Bravo-Garcia.   Bravo-Garcia sold cocaine in Chicago and received cocaine deliveries from Santana, who worked for Soto.   Respardo-Ramirez also delivered cocaine to Bravo-Garcia on Soto's behalf approximately twenty times.   Bravo-Garcia and Santana sold Soto's cocaine to two Detroit-based sellers, Jose and Francisco Enriquez-Enriquez, who resold the cocaine to Erik Freeman, another seller in Detroit.

One of these drug transactions from Soto to all of these middlemen went awry when another middleman, El Cartero, disappeared without paying Soto for a ten-kilogram cocaine delivery to the Enriquez-Enriquez brothers.   In response to this failed delivery, Soto told Garcia-Bravo, who had brokered the deal, to find the Enriquez-Enriquez brothers or El Cartero.   Santana was able to help:   he knew where the Enriquez-Enriquez brothers lived.   In October 2009, Garcia-Bravo, Santana, Gudino, Anthony Ramirez, and Christopher Espinoza hatched a plan to go to Detroit to look for the Enriquez-Enriquez brothers in order to collect the money or to bring them back to Chicago.   To accomplish that goal, they took two or three guns.

The plan was to pretend to meet with Jose Enriquez-Enriquez ("Enriquez-Enriquez") for a drug transfer and then use the guns to scare him.   When Enriquez-Enriquez arrived at the parking lot, Espinoza, Santana, and Anthony Ramirez confronted Enriquez-Enriquez and his cousin, Victor, and forced them into the van at gunpoint.   The group tied Enriquez-Enriquez's and Victor's hands with zip ties and duct tape and returned to Chicago, where they brought them to a garage.   Soto and Respardo-Ramirez met the group in the garage with guns.   Soto questioned Enriquez-Enriquez and Victor about the missing money.   After an hour of questioning, the kidnapping participants left the garage, but Respardo-Ramirez remained to guard Enriquez-Enriquez and Victor.   While Respardo-Ramirez was guarding, he placed his gun on a table in the garage.

The next day, Gudino, Bravo-Garcia, Anthony Ramirez, Espinoza, Santana, and Enriquez-Enriquez returned to Detroit.   The plan was to lure Freeman to meet with them by offering to sell three kilos of cocaine.   Once in the meeting, the group planned to force Freeman to deliver Soto's money.   The group brought the same two or three guns used during the first Detroit trip.   Bravo-Garcia confirmed that Respardo-Ramirez did not touch, use, or own the firearms used during the trip to Detroit.

Once in Detroit, the group met with Freeman, who insisted on cooking the cocaine to test its purity one kilo at a time.  Freeman rejected the first two kilos, but liked the third.  Next, Freeman took the group to a second house, where he kept his money.  Bravo-Garcia, Espinoza, Ramirez, and Santana followed Freeman into the house, guns in tow.  Bravo-Garcia, Espinoza, and Ramirez pointed their guns at Freeman, and Freeman and Enriquez-Enriquez fell to the floor.  After handing his gun to Santana, Bravo-Garcia took Freeman's money to the car.  By the time Bravo-Garcia had returned to the house, Santana, Ramirez, and Espinoza had tied Freeman to a pole in the basement of the house, where they left him.

Before driving back to Chicago, the group picked up a second car.  On the return drive to Chicago, police officers stopped and searched the cars and found the three kilos of cocaine, currency, and the three handguns in the car in which Gudino, Bravo-Garcia, and Ramirez were traveling.

**B.  Post-Trial Motions for Acquittal or New Trial**

After the trial, all defendants-appellants filed motions for judgment of acquittal or a new trial.  Santana argued that the evidence was insufficient for a rational jury to find him guilty of conspiracy to kidnap, kidnapping, and brandishing a firearm in furtherance of a crime of violence, namely the kidnapping.  Espinoza contended that there was insufficient evidence for a rational jury to reach the following conclusions:  that he specifically intended to deliver cocaine; that he joined the conspiracy to kidnap; that he participated in the kidnapping; and that he possessed a firearm.  Soto retained new counsel and argued that he was entitled to a judgment of acquittal because there was insufficient evidence of a specific intent to deliver cocaine.  Soto also asserted that he was entitled to a new trial because his original trial counsel was ineffective because he did not move to exclude evidence seized from 4309 W. 77th Place and 5318 S. Mozart Street in Chicago, Illinois.  Respardo-Ramirez joined Soto's motion for a new trial on the basis that the court should have excluded the evidence seized from the two locations.  Respardo-Ramirez filed an additional motion for acquittal on the basis that the evidence was insufficient to convict him of the conspiracy to possess and distribute cocaine, kidnapping, and possession of a firearm in relation to a drug trafficking crime.  Respardo-Ramirez focused on the sufficiency of

the evidence showing that he joined the conspiracy, that the kidnapping victims were taken across state lines forcibly, and that he owned or possessed the firearms listed in the indictment.

On August 12, 2013, the district court issued an opinion and order granting in part and denying in part the defendants' motions for judgment of acquittal, rejecting most of the defendants' claims.  R. 515 (Dist. Ct. Op. and Order) (Page ID #3444–79).  There was one exception:  the district court granted Respardo-Ramirez's motion for a judgment of acquittal as to Count 8, possessing and brandishing a firearm during and in relation to a crime of violence. R. 515 at 22–23, 36 (Page ID #3465–66, 3479).

## C.  Sentencing

Before the sentencing hearing, Santana filed a sentencing memorandum and objections to the Presentence Report ("PSR").  At the sentencing hearing, Santana's trial counsel objected to the classification of Counts 7 and 8 as mandatory consecutive sentences.  Soto also challenged the probation office's determination that his convictions for Counts 7 and 8 must run consecutively.  The district court rejected Soto's and Santana's Sixth Amendment challenges.

Santana received a 120-month sentence for Counts 1, 2, 5, and 6 to be served concurrently; an eighty-four-month sentence for Count 7 to be served consecutively to Counts 1, 2, 5, and 6; and also a 300-month sentence for Count 8 to be served consecutively to Count 7. Soto's sentence was 516 months of imprisonment:  132 months for Counts 1, 2, 5, 6, and 9 to run concurrently; eighty-four months for Count 7 to run consecutively to Counts 1, 2, 5, 6, and 9; and 300 months for Count 8 to run consecutively to the other terms of imprisonment.

## D.  Appeal

Soto, Santana, Espinoza, and Respardo-Ramirez appeal their convictions.  Soto and Santana appeal their sentences, as well.

Soto raises two issues on appeal.  First, he contends that his trial counsel was constitutionally ineffective because he did not move to suppress the evidence seized at 77th Place and Mozart Street.  Soto argues that had his trial counsel filed a motion to exclude the evidence, all of the evidence would have been suppressed because the good-faith exception to

the exclusionary rule does not apply.  Second, Soto argues that the imposition of the twenty-five year mandatory minimum sentence for a second or subsequent conviction under 18 U.S.C. § 924(c)(1)(C)(I) violates the Sixth Amendment and *Alleyne v. United States*, --- U.S. ---, 133 S. Ct. 2151 (2013), because a jury did not find that Counts 7 and 8 were second or subsequent offenses.

Santana raises three issues on appeal.  First, he argues that there was a fatal variance in the indictment because, under Count 2, the government had to prove a drug-distribution offense, but the evidence at trial established only a robbery.  Second, he asserts that the district court should have severed the drug-trafficking and kidnapping offenses so that they would be tried on different dates.  Third, he joins Soto's challenge to the mandatory twenty-five-year sentence for second or subsequent weapons convictions.

Espinoza argues only that the evidence does not support his convictions for Count 2, possession of cocaine with the intent to distribute, and Count 7, the related firearm charge. Specifically, he argues that the government did not provide sufficient evidence of the specific intent to distribute the cocaine.

Finally, Respardo-Ramirez raises five issues on appeal.  First, he argues that the district court admitted unduly prejudicial evidence of the stop and arrest of John and Valarie Boston in Las Vegas, Nevada.  Second, Respardo-Ramirez contends that the district court erroneously admitted evidence seized at 77th Place and Mozart Street in violation of the Fourth Amendment. Third, he claims that he is entitled to a judgment of acquittal with respect to Count 1, conspiracy to distribute cocaine, because the evidence did not establish that he possessed the specific intent to distribute cocaine.  Fourth, he asserts that this court should enter a judgment of acquittal as to Count 5 for kidnapping because the government failed to provide evidence that the victims were transported forcibly across state lines.  Fifth, he argues that the evidence was insufficient to hold him criminally liable for Count 7, brandishing a firearm during a crime of violence, under a theory of aiding and abetting because he never owned, possessed, or used the firearms listed in the indictment.

## II.  ANALYSIS

### A.  The Warrants

Officers from the Chicago Police Department executed two search warrants at 4309 West 77th Place ("77th Place") and 5318 South Mozart Street ("Mozart Street").  The search of 77th Place uncovered nearly $300,000 in United States currency, cocaine, marijuana, firearms, money counters, and drug packaging materials.  Officers seized items including firearms, Soto's false identifications, and banking records from the residence on Mozart Street.

Appellants Soto and Respardo-Ramirez seek either a new trial or a judgment of acquittal on the basis that the district court erred by admitting that evidence seized from 77th Place and Mozart Street on the grounds that the searches violated the Fourth Amendment.  Soto appeals the district court's denial of his post-trial motion for a new trial based on his claim of ineffective assistance of counsel because, he contends, his trial counsel was ineffective because he did not file a motion to suppress the drug evidence seized at 77th Place and Mozart Street.  Respardo-Ramirez argues that the district court erred by admitting the evidence but does not claim that his attorney was ineffective.

#### 1.  Soto's Ineffective-Assistance-of-Counsel Claim

##### a.  Standard of Review

The district court addressed Soto's ineffective-assistance-of-counsel of claim in the context of his motion for a new trial.  Rule 33 allows a district court, upon defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A violation of [a defendant's] Sixth Amendment right to effective assistance of counsel clearly meets [the interest-of-justice] standard."  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).  Usually we do not review claims of ineffective assistance of counsel on direct appeal.  *United States v. Angel*, 355 F.3d 462, 469 (6th Cir. 2004).  We may do so, however, if a claim rests "entirely upon facts within the record or present[s] purely legal questions."  *Id.*  This record provides sufficient evidence to evaluate Soto's particular ineffective-assistance-of-counsel claim because it presents purely legal questions:  whether the search warrants were facially defective and whether the good-faith exception to the exclusionary rule applies.

The district court denied Soto's motion for a new trial. R. 515 at 35 (Dist. Ct. Op. & Order) (Page ID #3478). In general, we review a district court's denial of a motion for a new trial for an abuse of discretion including when the defendant asserts that his counsel was ineffective. *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014). "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *Id.* at 559 (internal quotation marks omitted).

### b.  Deficient Performance and Prejudice

In order to demonstrate ineffective assistance of counsel, Soto must show that his counsel's performance was deficient and that he was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An attorney's performance is deficient if his representation "fell below an objective standard of reasonableness." *Id.* Courts owe trial counsel deference when reviewing his actions and omissions during trial. *Id.* at 689. When a defendant claims that his counsel was ineffective because counsel failed to litigate a Fourth Amendment claim, he must also show "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Soto cannot show prejudice, if the evidence was admissible under the good-faith exception to the Fourth Amendment's warrant requirement. *United States v. Baker*, 719 F.3d 313, 320–21 (4th Cir. 2013) (holding that the good-faith exception to the exclusionary rule applied, and therefore the defendant could not show *Strickland* prejudice). Courts do not suppress the evidence that officers "obtain in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). The good-faith exception does not apply in the following four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006) (citing *Leon*, 468 U.S. at 923).

Soto challenges the applicability of the good-faith exception on the third ground. The district court concluded that both affidavits were lacking in indicia of probable cause. R. 515 at 31–32 (Dist. Ct. Op. & Order) (Page ID #3474–75). Nevertheless, the district court concluded that the affidavits were not so lacking as to render the officers' reliance on those warrants objectively unreasonable. *Id.* at 34–35 (Page ID #3477–78).

"The conclusion that the officers' reliance on the warrant was objectively reasonable requires a 'less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause.'" *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (quoting *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc)) (internal quotation marks omitted). Neither affidavit in question here is "bare bones" or "boilerplate." *See United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996). Moreover, both warrants provide "a sufficient link between" 77th Place and Mozart Street and drug activity and the presence of illegal firearms "such that a reasonably well-trained officer would not have known that the search was illegal." *Higgins*, 557 F.3d at 391. In the affidavit for the 77th Place warrant, the attesting officer wrote that J. Doe claimed that Tony stored the sawed-off shotgun under a bed in the house at 77th Place. R. 476-2 at 2–3 (77th Pl. Warrant) (Page ID #1980–81). In the affidavit for a search warrant of the Mozart Street address, the attesting officer stated that, on that day, a J. Doe[1] said that he went to the Mozart Street address to buy cocaine. R. 476-3 at 1–2 (Mozart St. Warrant) (Page ID #1982–83). While at the residence, he said that he saw "Tony" hold a large, clear ziplock bag with small knotted plastic bags inside containing a white powder. *Id.* at 2 (Page ID #1983). Doe handed Tony $125.00 U.S. currency, and Tony gave J. Doe one of the small bags. Doe concluded that the substance was cocaine because he opened the knotted plastic bag and tested the substance by rubbing the powder against his gums. The

---

[1]It is unclear whether the J. Doe referenced in the Mozart Street warrant application is the same J. Doe who provided the information for the search warrant of 77th Place. The affidavits were signed by different police officers, and the conversations with the unidentified informant(s) occurred almost nine months apart. *Compare* R. 476-2 at 2–3 (77th Pl. Warrant) (Page ID #1980–81), *with* R. 476-3 at 1–2 (Mozart St. Warrant) (Page ID #1982–83).

attesting officer took J. Doe to 5318 S. Mozart Street, and J. Doe identified the house as the place where he received the white powder.  Accordingly, we conclude that the district court did not abuse its discretion by concluding that the challenged evidence would have been admitted under the good-faith exception to the exclusionary rule, and therefore Soto could not establish the prejudice required for his ineffective-assistance-of-counsel claim.  *See Dado*, 759 F.3d at 563; *Kimmelman*, 477 U.S. at 375.

### 2.  Respardo-Ramirez's Motion for New Trial

Respardo-Ramirez joins Soto's challenge to the admissibility of the evidence seized at 77th Place and Mozart Street, asserting that he has standing to pursue the claim because he resided at 77th Place.  We review a district court's denial of a motion for a new trial for an abuse of discretion.  *Dado*, 759 F.3d at 559.  Respardo-Ramirez's claim fails for the same reason Soto's fails:  the evidence would have been admitted under the good-faith exception to the exclusionary rule.  We therefore conclude that the district court did not abuse its discretion.

## B.  Santana's Severance Claim

### 1.  Standard of Review

On appeal, Santana argues for the first time that the district court erred by trying the kidnapping counts at the same time as the drug-trafficking counts.  None of the co-defendants filed a motion to sever the trials for the kidnapping offenses from the drug-trafficking offenses either.  The government argues that Santana waived his right to challenge the district court's decision to try the counts together because Santana did not file a motion to sever the counts before trial, and therefore we should not review Santana's challenge to the joinder of counts at all.  Santana responds that the proper standard of review is the plain-error standard because he only forfeited the issue of severance and did not waive it when he failed to file a motion to sever the counts before the pretrial motion deadline.

Federal Rule of Criminal Procedure 12(b)(3) lists the motions that "must be raised by pretrial motion."  Included among them is a motion for "severance of charges or defendants

under Rule 14." Fed. R. Crim. P. 12(b)(3)(D) (effective Dec. 1, 2014).[2]  Had Santana raised this issue after the district court's deadline, then Rule 12(c)(3) would govern the district court's ability to review his claim:  "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely.  But a court may consider the defense, objection, or request if the party shows good cause."  Fed. R. Crim. P. 12(c)(3).

Here, Santana raises this issue for the first time on appeal.  We previously treated the failure to file a timely motion listed in Rule 12(b)(3) as a waiver.  *United States v. Walden*, 625 F.3d 961, 967 (6th Cir. 2010).  We based this treatment on the previous wording of Rule 12(e), which "provide[d] that a party waives the ability to bring a motion [listed in Rule 12(b)(3)] by failing to file a motion before the pretrial motion deadline."  *Id*. (citing Fed. R. Crim. P. 12(b)(3), (e)).[3]  However, the recently amended version of Rule 12—which deletes the former Rule 12(e) and transfers applicable principles to Rule 12(c)(3)[4]—no longer refers to a "waiver."

When the term "waiver" first appeared in Rule 12(b)(2) in 1944,[5] and then moved to Rule 12(f) in 1975, and still later to Rule 12(e), the term "may have been unremarkable,"[6] 1A *Charles*

---

[2]The amended Federal Rules of Criminal Procedure modifying Rule 12 became effective on December 1, 2014, while this appeal was pending.  The Supreme Court's order adopting this amendment states that the amendment "shall govern in all proceedings in criminal cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."

[3]Federal Rule of Criminal Procedure 12(e) used to state, "A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides.  For good cause, the court may grant relief from the waiver."  Fed. R. Crim. P. 12(e) (effective until Dec. 1, 2014).

[4]The 2014 Advisory Committee's Note states, "Rule 12(e).  The effect of failure to raise issues by a pretrial motion has been relocated from (e) to (c)(3)."

[5]The original rule adopted in 1944 provided that, "Failure to present any such defense or objection [required to be raised by pretrial motion] constitutes a waiver thereof, but the court for good cause shown may grant relief from the waiver."  Rule 12(b)(2) (1944); 1A *Charles Alan Wright et al.*, *Federal Practice and Procedure: Federal Rules of Criminal Procedure* § 190 n.2 (4th ed. 2008).

[6]The Advisory Committee's Note, which discusses the initial adoption of the rule, does not include an explanation of the term "waiver."  *See* Fed. R. Crim. P. 12, 1944 advisory committee's note.  Instead, the committee differentiated between the types of defenses and objections subject to waiver, and those that were not.  *See id.*  Notably, the 1944 Advisory Committee did not refer to *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), which first defined the term "waiver" as "an intentional relinquishment or abandonment of a known right or privilege."  "Under the original rule it was unclear whether[] the waiver resulted only from a failure to raise the issue prior to trial or from the failure to do so by the deadline fixed by the judge.  The 1975 change made it clear that the latter view was intended."  *Wright et al.*, *supra* § 190 n.24.

In 2002, the Advisory Committee moved the contents of Rule 12(f) to Rule 12(e) and made a few stylistic changes, but did not "intend[] to make [a] change in the current law regarding waivers of motions or defenses."  Fed. R. Crim. P. 12, 2002 advisory committee's note; *see also Wright et al.*, *supra* § 190.

*Alan Wright et al.*, *Federal Practice and Procedure:  Federal Rules of Criminal Procedure* § 193 (4th ed. 2008), because the Supreme Court had not articulated a clear differentiation between a "waiver" and a "forfeiture."[7]   *See United States v. Olano*, 507 U.S. 725, 733–34 (1993). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'"  *Id.* at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  Since *Olano*, the term "waiver" in the context of Rule 12(e) caused great confusion among circuit courts about how the rule restricts appellate review. *Wright et al.*, *supra* § 193.[8]  Prior to the 2014 rule revision, we were inconsistent as well.  Often we treated a party's failure to file a timely pretrial motion as a "true wavier,"[9] sometimes we considered the failure to file a pretrial motion as a forfeiture subject to plain-error review,[10] sometimes we avoided resolving the proper characterization and conducted plain-error review in

---

[7]*Olano* was the first time a majority of the Supreme Court differentiated between "waiver" and "forfeiture."  As support, the Court cited a concurrence authored by Justice Scalia and numerous law review articles. *Olano*, 507 U.S. at 733 (citing *Freytag v. Commissioner*, 501 U.S. 868, 894 n.2 (1991) (Scalia, J., concurring in part and concurring in the judgment); Ralph S. Spritzer, *Criminal Waiver, Procedural Default and the Burger Court*, 126 U. Pa. L. Rev. 473, 474–77 (1978); Peter Westen, *Away from Waiver:  A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure*, 75 Mich. L. Rev. 1214, 1214–15 (1977)).  Thus, courts and scholars did not use the terms consistently until the Supreme Court clarified the difference in 1993.

[8]Some courts took the position that "Rule 12(e) says what it means and means what it says," and therefore a party's failure to file a motion before the deadline is a "true waiver"—an intentional relinquishment of a known right—and appellate review is completely foreclosed.  *United States v. Walker*, 665 F.3d 212, 228 (1st Cir. 2011); *see also United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008) (concluding that failure to file a motion to suppress before the pretrial deadline resulted in a true waiver, unless the appellant showed good cause to excuse the waiver). Other courts have used plain-error review instead.  *See, e.g.*, *United States v. Robinson*, 627 F.3d 941, 957 (4th Cir. 2010) (applying plain-error review of an issue that should have been raised before the pretrial deadline "[o]ut of an abundance of caution"); *United States v. Mahdi*, 598 F.3d 883, 887–88 (D.C. Cir. 2010) ("We need not resolve the parties' waiver dispute.  Because [the defendant] did not object in the district court to the alleged multiplicity, we review his arguments for plain error.").  And other courts have held that "in context the word 'waiver' in Rule 12(e) does not carry the strict implication of an intentional relinquishment of a known right that precludes all appellate review," but in order for the appellate court to conduct plain-error review, the party seeking appellate review must show good cause for the failure to file the motion.  *United States v. Johnson*, 415 F.3d 728, 730 (7th Cir. 2005) (internal quotation marks omitted).

[9]In *United States v. Crismon*, we held that "objections that appear for the first time on appeal are conclusively deemed to be waived, with the effect that we *are* deprived of jurisdiction."  905 F.2d 966, 969 (6th Cir. 1990).  Since *Crismon*, the Supreme Court overruled the jurisdictional aspect of our holding.  *United States v. Cotton*, 535 U.S. 625, 631 (2002).  Nevertheless, in *United States v. Brown*, which we decided after *Cotton*, we strictly applied Rule 12(e) and held that "'failure to raise 12(b) motions in a timely fashion precludes appellate review.'"  498 F.3d 523, 528 (6th Cir. 2007) (quoting *United States v. Oldfield*, 859 F.2d 392, 396 (6th Cir. 1988)); *see also United States v. Hackworth*, 483 F. App'x 972, 979 (6th Cir. 2012).

[10]In *United States v. Buchanon*, relying on *Olano*, we held that the appellant-defendants who had not argued their motions to suppress with specificity had forfeited the arguments raised on appeal in favor of suppression.  72 F.3d 1217, 1226–27 (6th Cir. 1995) (citing Fed. R. Crim. P. 12(f)).  We therefore reviewed the district court's decision to deny the motion to suppress for plain error.  *Id.* at 1227 (citing *Olano*, 507 U.S. at 732–33)).

the alternative,[11] and sometimes we examined whether the appellant had shown good cause for the failure to file a timely pretrial motion.[12]

In an apparent attempt to add some clarity to these muddy waters, the Advisory Committee recently recommended omitting the "non-standard use of the term 'waiver'" from Rule 12. *Advisory Committee on Criminal Rules, Minutes* 3 (Apr. 25, 2013) (hereinafter *April 25, 2013 Advisory Committee Minutes*). The Advisory Committee made clear the reason for the recommended change:

> New paragraph (c)(3) governs the review of untimely claims, previously addressed in Rule 12(e). Rule 12(e) provided that a party "waives" a defense not raised within the time set under Rule 12(c). Although the term waiver in the context of a criminal case ordinarily refers to the intentional relinquishment of a known right, Rule 12(e) has never required any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion. Accordingly, to avoid possible confusion the Committee decided not to employ the term "waiver" in new paragraph (c)(3).
>
> New paragraph 12(c)(3) retains the existing standard for untimely claims. The party seeking relief must show "good cause" for failure to raise a claim by the deadline, a flexible standard that requires consideration of all interests in the particular case.
>
> *Rule 12(e)*. The effect of failure to raise issues by a pretrial motion has been relocated from (e) to (c)(3).

Fed. R. Crim. P. 12, 2014 advisory committee's note.

---

[11]In *United States v. Lopez-Medina*, we acknowledged the tension between then-Rule 12(e) and Rule 52(b). 461 F.3d 724, 739 (6th Cir. 2006). We recognized our prior cases in which we had held that the failure to file a pretrial suppression motion was a categorical bar to appellate review. *Id.* (citing *Crismon*, 905 F.2d at 969). We also noted that we had applied plain-error review to new suppression arguments raised for the first time on appeal when the defendant *had filed* a pretrial motion to suppress on other grounds. *Id.* (citing *United States v. Critton*, 43 F.3d 1089, 1094 (6th Cir. 1995)). Without resolving the tension between those cases, however, we rejected the appellant-defendant's argument under plain-error review. *Id.*; *see also United States v. Harper*, 488 F. App'x 63, 66 (6th Cir. 2012) (after concluding that the appellant-defendant had not made an argument about why there was good cause for his untimely argument and that the issue had been waived, we held that even if the defendant had shown good cause for the untimely objection, the defendant had not satisfied the plain-error standard).

[12]We have usually considered whether an appellant has shown good cause to excuse the failure to file a Rule 12(b)(3)(C) pretrial motion when the appellant had filed an untimely motion in the district court. *Walden*, 625 F.3d at 964. In *Walden*, we noted that "[t]he potential harshness of a strict application of [Rule 12(e)] is mitigated by a safety valve that allows district courts to grant relief from the waiver for 'good cause.'" *Id.* (citing Fed. R. Crim. P. 12(e)). Because the appellant-defendant had filed the untimely motion in the district court, and the district court had found good cause lacking, we reviewed for abuse of discretion the district court's denial of a motion to file an untimely pretrial motion to suppress. *Id.* (citing *United States v. Lewis*, 605 F.3d 395, 401 (6th Cir. 2010)).

Santana argues that the deletion of the term "waiver" was a "substantive" change to the rule, and therefore we may no longer treat the failure to file a timely pretrial motion as an intentional relinquishment of a known right that forecloses appellate review.  Santana Resp. to Pet. for Rehr'g at 2.  In contrast, the government contends that the retention of "'the existing standard for untimely claims'" includes retention of our prior standard of review—a complete bar to appellate review.[13]  Pet. for Panel Rehr'g at 8–9 (quoting Fed. R. Crim. P. 12, 2014 advisory committee's note).  To resolve this dispute, we begin by looking at the government's argument.

Contrary to the government's claim, the sentence from the 2014 Advisory Committee's Note does not lead to the ineluctable conclusion that the amendments to Rule 12(c)(3) do not alter the standard of review that appellate courts must apply to Rule 12(b)(3) issues raised for the first time on appeal.  The government relies heavily on a topic sentence of a paragraph that reads as follows:

> New paragraph 12(c)(3) retains the existing standard for untimely claims. The party seeking relief must show "good cause" for failure to raise a claim by the deadline, a flexible standard that requires consideration of all interests in the particular case.

Fed. R. Crim. P. 12, 2014 advisory committee's note.  In context, the sentence appears to refer to the good-cause standard, not to the impact of that standard on appellate review.

The rulemaking history adds support for this conclusion.  In September 2013, the Committee on Rules of Practice and Procedure transmitted the proposed changes to Rule 12 to the Supreme Court. *Addendum to the Report of the Judicial Conference Committee on Rules of Practice and Procedure* 2 (Mar. 2014) [hereinafter *Addendum to the 2014 Committee on Rules Report*].  One of the proposed changes to Rule 12 was to amend Rule 12(c)(3) to read as follows:

> (3)     Consequences of Not Making a Timely Motion Under Rule 12(b)(3).  If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely.  But a court may consider the defense, objection, or request if:
>
> (A)     the party shows good cause; or
>
> (B)     for a claim for failure to state an offense, the defendant shows prejudice.

---

[13]The government and Santana have differing opinions about whether this is, in fact, the standard required by our precedent.

*Id.* app. C at 5–6; *see also Addendum B1 to the Report of the Advisory Committee on Criminal Rules to the Standing Committee on Rules of Practice and Procedure* 2 (May 2013) [hereinafter *May 2013 Report to the Standing Committee*].  The Supreme Court had three concerns about the proposed change to Rule 12(c)(3):  "(1) to whom is prejudice relevant—the government, the defendant, both?; (2) how does one show prejudice pre-trial?; and (3) why use good cause alone as the test in subdivision (c)(3)(A) and prejudice alone as the test in subdivision (c)(3)(B), and does this anomaly create unintended consequences?"  *Addendum to the Committee on Rules Report*, *supra*, at 2.  In light of these questions, "the advisory committee unanimously agreed to change the proposed amendment to subdivision (c)(3) to apply a good cause standard to *all* late-filed non-jurisdictional motions."  *Id.* at 3.  The resulting rule reads as follows:

> (3)      Consequences of Not Making a Timely Motion Under Rule 12(b)(3).  If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely.  But a court may consider the defense, objection, or request if the party shows good cause.

*Id.* app. B at 5.  Thus, the Advisory Committee's Note about the "existing standard for untimely claims" simply clarifies that district courts should not apply different standards to different types of Rule 12(b)(3) motions, as the original proposal had suggested.  The Advisory Committee's Note therefore does not resolve the question now before us:  Does the failure to file a timely Rule 12(b)(3) motion result in a waiver, barring all appellate review?

To answer that question, we begin with the text of the new Rule 12(c)(3).  When interpreting rules, we must give effect to the plain meaning of the text.  *Perez v. Postal Police Officers Ass'n*, 736 F.3d 736, 740 (6th Cir. 2013).  When examining the plain meaning of the rule, we "'look[] at the language and design of the [rule] as a whole,'" and "[i]f the [rule's] language is not clear, we may examine the relevant legislative history."  *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008) (quoting *United States v. Wagner*, 382 F.3d 598, 606–07 (6th Cir. 2004)).  The Advisory Committee's decision to delete the word "waiver" was quite intentional, as the Advisory Committee explained in its 2014 note.  Indeed, one of the primary reasons to eliminate the term "waiver" from the rule was because the committee believed that courts were incorrectly treating the failure to file a timely pretrial motion as an intentional relinquishment of a known right, and therefore an absolute bar to appellate review.  During the

drafting process, Judge Sutton, the chair of the Standing Committee, emphasized that it was "imperative to get rid of the term 'waiver' in Rule 12(e)," noting that the language was drafted before *Olano* and "makes no sense now." *April 25, 2013 Advisory Committee Minutes*, *supra*, at 6.

The Advisory Committee's Note about Rule 12 provides additional evidence to support the conclusion that appellate courts are not to presume that a defendant's failure to file a timely pretrial motion is a waiver. Fed. R. Crim. P. 12, 2014 advisory committee's note ("Although the term waiver in the context of a criminal case ordinarily refers to the intentional relinquishment of a known right, Rule 12(e) has never required any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion."). Thus, the drafters apparently believed the term "waiver" was "outdated in light of *Olano*," and therefore "changed the term" to give the rule new meaning. *See United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008) (relying on the failure to revise Rule 12(e) to eliminate the term "waiver" in 2002, after *Olano*, when Rule 12(f) was moved to Rule 12(e) and other revisions were made); *see also Walker*, 665 F.3d at 228 ("We believe that Rule 12(e) says what it means and means what it says . . . particularly since Congress amended it in 2002 (after the Supreme Court had made the distinction between waiver and forfeiture pellucid) and left the 'waiver' terminology intact."). The Advisory Committee's conscious decision to abandon the term "waiver" makes its intent crystal clear: courts may no longer treat a party's failure to file a timely Rule 12(b)(3) pretrial motion as an intentional relinquishment of a known right.

The more difficult question is whether the change to Rule 12(c)(3) means that we may review Santana's claim for plain error. Santana argues that the good-cause standard applies to *district courts*, and therefore appellate courts are free to consider how the change in the rule impacts appellate review. Santana Resp. to Pet. for Rehr'g at 2. As always, we begin with the text of the rule, keeping in mind that "reasonable [rule] interpretation must account for 'both the specific context in which language is used' and 'the broader context of the statute as a whole.'" *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (alteration omitted).

Federal Rule of Criminal Procedure 1(a)(1) provides that "[t]hese rules govern the procedure in all criminal proceedings in the United States district courts, the United States courts of appeals, and the Supreme Court of the United States." Furthermore, Rule 1(b)(2) provides the following definition of "Court": "a federal judge performing functions authorized by law." And a "federal judge" is "a justice or judge of the United States as these terms are defined in 28 U.S.C. § 451," which "includes judges of the courts of appeals [and] district courts." The logical extension of Rule 1 would mean that Rule 12(c)(3) applies to the courts of appeals, and any use of the word "court" in Rule 12 would similarly apply to appellate courts. But the more specific Rule 12 refers repeatedly to "the court" in nearly all of its subparts, and each subpart clearly addresses the functions of district courts—not appellate courts.[14] There is one notable exception. Rule 12(c)(3) provides, "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But *a court* may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3) (emphasis added). This is the only instance where Rule 12 refers to "a court," and therefore the Advisory Committee's decision to use "*a* court" may have been a conscious decision to refer to all courts because "a" is an indefinite article.[15] "In a few usages," however, "the indefinite article provides a specific reference {I saw a great movie last night} and the definite article a generic reference {the Scots are talking about independence} . . . ." *The Chicago Manual of Style* § 5.71 (16th ed. 2010). The text of the Rule does not resolve whether "a court" in Rule 12(c)(3) applies to appellate courts' review of an untimely Rule 12(b)(3) motion, and therefore we now turn to the canons of statutory construction to attempt to resolve the ambiguity.

---

[14]Substituting the words "the appellate court" for "the court" demonstrates how Rule 1(b)(2) is inapplicable in the context of much of Rule 12(c). For example: "The court may, at the arraignment or as soon afterward as practicable set a deadline for the parties to make pretrial motions and may also schedule a motion hearing." Fed. R. Crim. P. 12(c)(1). In the appellate context, the rule does not make sense because appellate courts do not conduct arraignments, nor do they set deadlines for pretrial motions and hearings because appellate courts do not conduct trials. It is similarly absurd to read Fed. R. Crim. P. 12(d) to control the function of appellate courts: "The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. . . . When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Again, the rule is inapplicable to appellate courts because appellate courts cannot defer rulings until after trial because they do not conduct trials, and appellate courts cannot find facts.

[15]Indefinite articles, such as "a judge" or "a defendant" "point[] to nonspecific objects, things, or persons that are not distinguished from the other members of class." *The Chicago Manual of Style* § 5.70 (16th ed. 2010). In contrast, definite articles, such as "the sights of Chicago" or "the grand prize," "point[] to a definite object that (1) is so well understood that it does not need description . . . (2) is a thing that is about to be described . . . or (3) is important." *Id.* § 5.69.

A few canons of construction lead toward the conclusion that Rule 12(c)(3) applies to the district courts alone.  First, "it is a commonplace of statutory construction that the specific governs the general."  *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384 (1992).  Accordingly, because Rule 12 is more specific than the general Rule 1(b)(2), we should construe Rule 12(c) as an exception to the general rule that the Federal Rules of Criminal Procedure apply to the district and appellate courts.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012).  Second, "under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 315–16 (2006) (internal quotation marks omitted).  Although it would be strange to apply only one of Rule 12's subparts to the appellate courts and the others to only district courts, we cannot discount the apparently intentional decision to use the term "a court" instead of "the court," and thus we now turn to the rulemaking history to resolve the lingering ambiguity in the text.

The rulemaking history of the 2014 amendment to Rule 12 strongly indicates that the Rule's drafters were crafting a rule to apply to the district courts, and not to the courts of appeals. Records available suggest that the Advisory Committee considered and rejected an amendment to include a cross reference to Rule 52[16] from a draft version of Rule 12(c)(3) because it was "unnecessarily controversial."  Fed. R. Crim. P. 12, 2014 advisory committee's note.  The Criminal Rules Subcommittee minutes reveal why:  "The Subcommittee ultimately agreed it was best not to try to tie the hands of appellate courts." *April 25, 2013 Advisory Committee Minutes*, *supra*, at 4; *see also May 2013 Report to the Standing Committee*, *supra*, at 5–6 ("The amended rule, like the current one, continues to make no reference to Rule 52 (providing for plain error review of defaulted claims), thereby permitting the Courts of Appeals to decide if and how to apply Rules 12 and 52 when arguments that should have been the subject of the required Rule 12(b)(3) motions are raised for the first time on appeal.").  For that reason, the subcommittee deleted the proposed reference to Rule 52 in order to "allow the appellate courts to determine

---

[16]Federal Rule of Criminal Procedure 52 defines harmless and plain error:

(a)     HARMLESS ERROR.  Any error, defect, irregularity, or variance that does not affect
        substantial rights must be disregarded.

(b)     PLAIN ERROR.  A plain error that affects substantial rights may be considered even
        though it was not brought to the court's attention.

whether to apply the standards specified in Rule 12(c) or the plain error standard specified in Rule 52 when untimely claims are raised for the first time on appeal." *Id.* at 4. When the subcommittee opened the floor to further discussion or proposed amendments, however, Judge Sutton emphasized that "[g]iving district judges more flexibility before trial is very important," and he stated, "It's becoming clearer that this is a rule addressed to the district courts." *Id.* at 6.

In an attempt further to clarify the rule, Judge Sutton suggested that the subcommittee substitute the word "forfeiture" for "waiver." *Id.* After discussion, the subcommittee unanimously rejected the proposal, because some committee members expressed concern that "forfeiture" "was the language of appellate courts, and the rule was principally directed at the district courts." *Id.* at 9. Other subcommittee members also noted "the disagreement in the application of forfeiture in the appellate cases" and "that forfeiture is generally associated with the plain error standard, not the good cause/cause and prejudice standards." *Id.* In context, the subcommittee members' primary concern was that district judges would apply a plain-error standard to late motions, and the subcommittee did not wish to tie the hands of district courts in exercising their discretion. Accordingly, the rulemaking history clarifies that Rule 12 is generally directed at the district courts, not the appellate courts, and we, as the court of appeals, must now determine whether to apply the good-cause or plain-error standard to issues raised for the first time on appeal.

We hold that under the current version of Rule 12(c)(3), we do not treat the failure to file a motion as a waiver unless the circumstances of the case indicate that the defendant intentionally relinquished a known right. When a party files an untimely motion in the district court, and the district court finds facts to determine whether the late movant has satisfied the good-cause standard, we review that determination for an abuse of discretion as we did before. *Walden*, 625 F.3d at 967. We believe this will give effect to the Advisory Committee's decision to retain the good-cause language in Rule 12(c)(3). Fed. R. Crim. P. 12, 2014 advisory committee's notes. In addition, we believe that the good-cause standard may be difficult to apply on appeal if the issue was not first raised at the district court because review for good

cause often requires developing and analyzing facts to determine whether a defendant has shown good cause for the late filing.**17**

We also hold that plain-error review applies to claims of misjoinder raised for the first time on appeal. There are four parts to plain-error review. "First, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived by the appellant." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *Olano*, 507 U.S. at 732–33 (1993)). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* "Third, the error must have affected the appellant's substantial rights," which usually "means he must demonstrate that it affected the outcome of the district court proceedings." *Id.* (internal quotation marks omitted). Fourth, if the first three prongs are satisfied, the "the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation, internal alterations, and internal quotation marks omitted).

Plain-error appellate review serves important policy objectives. First, the standard encourages parties to meet deadlines set by district courts and to seek leave in the district courts to file late motions. By bringing the error to the district court's attention in the first instance, the late movant has a better opportunity to develop a record to address why the motion is untimely and how the error is prejudicial.**18** District courts may also address non-obvious defects, which an appellate court would not be authorized to correct because plain-error review permits appellate courts to rectify only *plain* error, and the error may not be obvious or appear prejudicial in an undeveloped record.

---

**17**Indeed, at least one scholar noted that "[i]n determining whether to grant relief, a court will sometimes reach the merits of [the] defendant's argument to determine whether [the] defendant would be prejudiced by enforcing the waiver," which the scholar noted "is really no more than the application of the plain error rule." 24-612 *Moore's Federal Practice—Criminal Procedure* § 612.06 (2015) (collecting cases).

**18**Courts have found cause to excuse the untimely filing of a pretrial motion when "the defendant had insufficient time to act or had no prior notice of the error, defect, or objectionable action despite due diligence, or the ineffective assistance of counsel." 24-612 *Moore's Federal Practice* § 612.06 (footnotes omitted). In many of these instances, the late movant would have to develop a factual record of late notice, due diligence, or ineffective assistance of counsel. Some courts have held that "a change in the law during the pendency of an appeal" constitutes good cause. *Id.*

Second, plain-error review discourages deleterious defense practices.  Appellate courts may exercise their discretion to remedy the error only if the error seriously affects the fairness and integrity of the proceedings.  Thus, if there is evidence to suggest that the defense attorney sat "silently by" in order to "take his chances with the jury" with full knowledge of the error and then "ambush[ed] the prosecution through a post-trial attack," then the appellate court could and should decline to exercise its discretion.  *Walker*, 665 F.3d at 228.

Third, plain-error review discourages overzealous advocacy by the government.[19]  For example, the government might knowingly join charges that would prejudice a defendant at trial, thereby making conviction more likely, and hope that neither the defense attorney nor the district court would notice the misjoinder of counts.  In such a case, plain-error review would permit an appellate court to correct the error and thereby discourage the government from taking advantage of a known prejudicial error.  For these reasons, we hold that, when a defendant fails to file a Rule 14 motion to sever counts before trial, and argues for the first time on appeal that offenses were improperly joined, we review his or her claim for plain error.

Given that the record does not establish that Santana intentionally relinquished a known right, we treat Santana's failure to file a motion to sever the counts before trial as a forfeiture: "the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 733.  Because Santana did not raise this issue in the district court, we review the joinder of counts for plain error.

### 2.  Misjoinder and Severance

Rule 8 permits the government to join multiple offenses "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  Rule 14 authorizes a district court to sever the joined offenses if it appears that the consolidation will prejudice the defendant. Fed. R. Crim. P. 14.  The government has met the requirements of Rule 8(a) because the kidnapping and drug-trafficking offenses are part of a common scheme or plan.  Prejudice arises when "there is a serious risk that a joint trial would compromise a specific trial right of one

---

[19]Although most discussions of plain-error review expresss concerns about underhanded or overzealous conduct by defense lawyers, we have no reason to believe that overzealousness or underhandedness is a problem exclusive to the defense bar.

of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). To determine whether prejudice arose as a result of the joinder, we "consider such factors as whether spillover evidence would incite or arouse the jury to convict on the remaining counts, whether the evidence was intertwined, the similarities and differences between the evidence, the strength of the government's case, and the ability of the jury to separate the evidence." *United States v. Dale*, 429 F. App'x 576, 579 (6th Cir. 2011) (citing *United States v. Rooney*, 37 F.3d 847, 855–56 (2d Cir. 1994); *United States v. Pelullo*, 14 F.3d 881, 898–99 (3d Cir. 1994); *United States v. Murphy*, 836 F.2d 248, 256 (6th Cir. 1988)).

Santana cannot show that the joinder of the cocaine counts with the kidnapping counts prejudiced his defense. Santana concedes that the charges were interrelated. But he contends that his role in the kidnapping venture was minor, and therefore trying the two charges together made Santana seem like a hard-core drug trafficker when he was small-time participant. Had the charges been tried separately, he argues, the jury would have been able to evaluate his minimal role in the kidnapping more dispassionately. Santana, however, needs to offer more than conclusory statements to show that the joinder prejudiced his defense. *See United States v. Hang Le-Thy Tran*, 433 F.3d 472, 478 (6th Cir. 2006). The jury's demonstrated ability to compartmentalize the evidence and evaluate how the evidence applies to separate, interrelated charges undermines Santana's prejudice argument because the jury acquitted Espinoza of Count 1 and Respardo-Ramirez of Count 5. Santana has not met his burden to show that the joinder of the counts prejudiced his defense. Accordingly, the joinder of the kidnapping and drug-trafficking counts was not error, let alone plain error.

## C. The Sufficiency of the Evidence that Respardo-Ramirez Joined the Cocaine Conspiracy

Respardo-Ramirez challenges the sufficiency of the evidence to support a conviction for Count 1, conspiracy to possess with intent to distribute cocaine. When reviewing the sufficiency of the evidence after a jury votes to convict, we review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lutz,* 154 F.3d 581, 587 (6th Cir. 1998) (quoting *United States v. Atkin,* 107 F.3d 1213, 1218 (6th Cir. 1997)).

To find Respardo-Ramirez guilty of a conspiracy under 21 U.S.C. § 846 the government had to prove (1) that there was an agreement to violate federal narcotics laws, (2) that Respardo-Ramirez had knowledge of and the intent to join the conspiracy, and (3) that Respardo-Ramirez participated in the conspiracy. *See United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996). "A tacit or material understanding among parties to a conspiracy is sufficient to establish agreement." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012). Circumstantial evidence may establish an agreement if a reasonable interpretation of the evidence is that a defendant participated in a common plan. *Id.*

The only evidence linking Respardo-Ramirez to the drug conspiracy is Bravo-Garcia's testimony. Bravo-Garcia testified that Respardo-Ramirez delivered cocaine to Bravo-Garcia on behalf of Soto approximately twenty times. Moreover, Bravo-Garcia stated that Respardo-Ramirez was at the garage where Soto and the others brought Enriquez-Enriquez and Victor after the first trip to Detroit. And Respardo-Ramirez remained in the garage to guard Victor while Soto and the others returned to Detroit to rob Freeman. We believe therefore that a reasonable jury could have concluded that the plots to rob Freeman and to kidnap Enriquez-Enriquez were all part of a plan to help Soto collect a drug debt, and thus related to the drug conspiracy.

The district court concluded that Bravo-Garcia's testimony alone was sufficient to allow a reasonable jury to conclude that Soto and Respardo-Ramirez had an agreement. R. 515 at 9 (Dist. Ct. Op. & Order) (Page ID #3452). There is no reason to disturb that finding. "Testimony by co-conspirators alone can be sufficient to prove the existence of a conspiracy." *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003).

Respardo-Ramirez raises reasons to doubt Bravo-Garcia's testimony, namely that Bravo-Garcia mentioned Respardo-Ramirez's involvement in the conspiracy only after agreeing to cooperate with the government and entering plea negotiations. But there is nothing in the record that leads us to believe that no reasonable jury could find him credible. Accordingly, there is sufficient evidence for a rational jury to find that Respardo-Ramirez participated in the conspiracy to distribute narcotics.

**D.  Respardo-Ramirez's Variance Claim**

Respardo-Ramirez argues that the district court erred by admitting testimony and drug evidence related to the search and arrest of Valerie and John Boston.  Special Agent Rande, with the Drug Enforcement Administration ("DEA"), received information from a confidential informant about a GMC van with hidden compartments designed to transport narcotics.  A magistrate judge approved Rande's application for a warrant to place a GPS tracking device on the van.  The DEA tracked the van from Detroit, Michigan, to Dayton, Ohio, and then to Las Vegas, Nevada.  The van was registered in Valerie Boston's name.  On May 18 or 19, 2009, Nevada State Trooper Officer Moonin stopped and searched the van, uncovering cell phones, U.S. currency, cocaine, and firearms.  After that search, the DEA received a warrant to wiretap the cell phone and monitored calls to Valerie Boston's phone.  The intercepted phone calls included conversations with Freeman and Enriquez-Enriquez.

Respardo-Ramirez now argues that the admission of the drug evidence prejudiced him because it resulted in a variance between the indictment and the evidence presented at trial.  He contends that the evidence established the existence of multiple drug conspiracies:  the Freeman conspiracy and the Soto conspiracy.  He claims that the admission of the evidence from the Nevada seizure confused the jury, and therefore the jury overlooked the lack of evidence connecting Respardo-Ramirez to either conspiracy and, instead, transferred the Bostons' guilt onto Respardo-Ramirez.

"Ordinarily, this court reviews de novo the question of whether a variance has occurred." *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013).  But if the defendant argues that there was a variance for the first time on appeal, then we review for plain error.  *Id.*  The government contends that Respardo-Ramirez has waived his right to challenge the admission of the Nevada evidence and to assert that a fatal variance occurred, and that therefore we cannot review either claim.  Appellee Br. at 34 (citing *Olano*, 507 U.S. at 732–33).  In the government's view, Respardo-Ramirez "intentionally relinquish[ed] or abandon[ed] . . . a known right" to object to the admission of the evidence, *Olano*, 507 U.S. at 733 (internal quotation marks omitted), because he failed to object at trial to the introduction of the evidence seized in Nevada and his trial counsel eventually said he was "satisfied" with the district court's decision not to submit the

two-conspiracy jury instruction. *See* R. 486 at 79–80 (Trial Tr. Apr. 19, 2013) (Page ID #2165–66); R. 546 at 7 (Trial Tr. May 3, 2013) (Page ID #3981).

We need not decide the issue, however, because—even under plain-error review—Respardo-Ramirez would not prevail. Under that standard, we have discretion to remedy a clear or obvious error that affected a defendant's substantial rights. *Puckett*, 556 U.S. at 135. There was not a plain or obvious error here. "In conspiracy cases, 'a variance constitutes reversible error only if . . . the indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Adams*, 722 F.3d at 805–06 (quoting *Caver*, 470 F.3d at 235–36). Respardo-Ramirez fails to meet this standard and also fails to show the prejudice required to establish any impact on his substantial rights. His variance challenge therefore fails.

**E.  The Sufficiency of the Evidence of Specific Intent to Distribute Cocaine**

Santana and Espinoza challenge their convictions for Count 2, aiding and abetting possession with intent to distribute cocaine. Santana argues that there was a variance between the indictment and the evidence. Espinoza argues that the government failed to present sufficient evidence of his specific intent to distribute the cocaine. Both appellants argue that although the evidence at trial established that Espinoza and Santana possessed 500 or more grams of cocaine, nonetheless they never intended to distribute the cocaine because the cocaine was just a ruse to lure Freeman to a meeting.

**1.  Variance**

Santana couches his argument in terms of a fatal variance, but the government contends that Santana is actually challenging the sufficiency of the evidence. When the defendant-appellant "is really claiming that the evidence in this case was insufficient to convict him," we employ the typical sufficiency standard of review by viewing the evidence in the light most favorable to the government. *United States v. Bearden*, 274 F.3d 1031, 1040 (6th Cir. 2001). The gravamen of Santana's argument is that the government proved robbery—not possession with intent to distribute cocaine—because the government failed to prove the requisite specific intent to distribute cocaine. We agree with the government that Santana's argument is actually

about the sufficiency of the government's evidence, and therefore we analyze his claim as a challenge to the sufficiency of the evidence.

### 2. Sufficiency of the Evidence

Santana and Espinoza argue that the government did not present sufficient evidence of their specific intent to distribute cocaine.  Read together, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II) prohibit "knowingly or intentionally . . . possess[ing] with intent to manufacture, distribute, or dispense" 500 grams or more of cocaine.  It is a specific-intent crime; the government must prove that the defendants specifically intended to distribute the drugs. *United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011).  Title 21 U.S.C. § 802(11) defines "distribute" as "to deliver (other than by administering or dispensing) a controlled substance." Subsection eight defines "deliver" as "the actual, constructive, or attempted transfer of a controlled substance."  *Id.* § 802(8).  The statute does not define "transfer."  *See id.* § 802. Santana and Espinoza argue that a "transfer" requires an actual showing that a defendant intended to relinquish his superior right to exercise control over the narcotics.  The government offers two arguments in response.  First, it argues that "the statute does not require intent to *permanently* transfer control."  Appellee Br. at 37.  Second, the government argues that "[t]he jury could reasonably infer that Santana and Espinoza knew that Soto did not intend to allow them to keep the three kilograms of cocaine he provided as bait, but that they would have to return it to him or take it to a customer."  *Id.* at 40.

We decline to address the appellants' statutory argument because we conclude that the evidence was sufficient to convict Espinoza and Santana even under the meaning of "transfer" they advocate.  "[E]vidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (emphasis in original) (internal quotation marks omitted).  That standard "requir[es] only that jurors draw reasonable inferences from basic facts to ultimate questions." *Id.* (internal quotation marks omitted).  We agree with the government that a jury could reasonably infer that Santana and Espinoza aided and abetted Soto to possess cocaine with the intent to distribute it.

The evidence at trial established that the plot to rob Freeman was part of the broader drug-distribution conspiracy. The group went to Detroit to collect a drug debt after El Cartero disappeared without paying Soto for the drug delivery. Soto gave the group three kilograms of cocaine as bait. After the robbery in Detroit, Espinoza, Santana and the others began driving back to Chicago with the cocaine in Soto's car. The evidence established that Soto was in the cocaine business and sold Bravo-Garcia six to eight kilos of cocaine every week. In addition, Soto sold cocaine to Freeman, who cooked, packaged, and sold the cocaine to customers in Detroit. These facts are sufficient for the jury reasonably to infer that Espinoza and Santana would return the cocaine to Soto in Chicago, where it would be sold to other buyers like Bravo-Garcia and Freeman. Accordingly, Espinoza's and Santana's argument fails.

**F.  Sufficiency of the Evidence of a Forcible Transport Across State Lines**

Respardo-Ramirez challenges the sufficiency of the evidence to support his conviction on Count 6, kidnapping in violation of 18 U.S.C. § 1201. Respardo-Ramirez argues that there is no evidence to support a finding that the kidnapping victims did not consent to the transportation across state lines. If the victims were released before crossing state lines from Michigan into another state, or if the victims consented to crossing state lines, then the government's proof fails. *See United States v. Toledo*, 985 F.2d 1462, 1467 (10th Cir. 1993); *United States v. Dixon*, 592 F.2d 329, 340 (6th Cir. 1979) (citing the elements of kidnapping for 18 U.S.C. § 1201(a)).

We turn to the evidence in the record. Gudino and Bravo-Garcia testified that they pointed guns at Enriquez-Enriquez and Victor to force them into the van. Santana, Ramirez, and Espinoza used zip ties and tape to bind Enriquez-Enriquez and Victor, and the victims' hands were still tied behind their backs when they arrived in Chicago. Based on that evidence, a reasonable jury could conclude that the victims' hands were tied when Santana, Ramirez, and Espinoza transported them across state lines. And it is reasonable to infer that Enriquez-Enriquez and Victor did not consent to being tied up in the van as they crossed the borders of Michigan, Indiana, and Illinois. Thus, we reject Respardo-Ramirez's argument.

**G.  Sufficiency of the Evidence of Aiding and Abetting the Brandishing of a Firearm**

Espinoza and Respardo-Ramirez challenge the sufficiency of the evidence to support their convictions on Count 7, brandishing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).

Espinoza challenges the sufficiency of the evidence establishing that he aided and abetted the brandishing of a firearm in furtherance of a drug-trafficking crime.  He argues that the government failed to prove that he had the requisite specific intent to distribute cocaine because the jury acquitted him of conspiracy to distribute cocaine.  Because we hold that the evidence is sufficient to support Espinoza's conviction on Count 2, possession with intent to distribute 500 or more grams of cocaine, *supra* Section E, there was sufficient evidence for a rational jury to find that Espinoza had the specific intent to distribute cocaine.  Thus, there is sufficient evidence that he aided and abetted the brandishing of a firearm in furtherance of a drug-trafficking crime.

Respardo-Ramirez also challenges the sufficiency of the evidence for his conviction on Count 7, brandishing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).[20]  Unlike Espinoza, Respardo-Ramirez was not charged or convicted on Count 2.  In his case, the predicate offense was the conspiracy to possess with intent to distribute cocaine.

There was no evidence that Respardo-Ramirez owned, possessed, or used the firearms listed in the indictment.  Santana, Espinoza, Ramirez, Gudino, and Bravo-Garcia brandished the firearm in Detroit, but Respardo-Ramirez was in Chicago at the time the others brandished their guns.  Instead, the grand jury charged Respardo-Ramirez as an aider and abettor of the firearm brandishing.

To find a defendant criminally liable as an aider and abettor under 18 U.S.C. §§ 2 and 924(c), the government must offer sufficient proof that the defendant "(1) [took] an affirmative act in furtherance of that [drug trafficking] offense, (2) with the intent of facilitating the offense's

---

[20]The district court entered a judgment of acquittal for Respardo-Ramirez on Count 8, brandishing a firearm in furtherance of and during and in relation to a crime of violence.  R. 515 at 23 (Dist. Ct. Op. & Order) (Page ID #3466).

commission." *Rosemond v. United States*, --- U.S. ---, 134 S. Ct. 1240, 1245 (2014). Liability attaches even where the defendant aids "only one (or some) of a crime's phases or elements." *Id.* at 1247. Thus, Respardo-Ramirez's conviction must stand if, viewing the evidence in the light most favorable to the government, there is evidence that he "facilitat[ed] either the drug transaction or the firearm use (or of course both)." *Id.* There is one limitation: the government must also prove that the defendant knew in advance "that one of his confederates will carry a gun" to further the drug offense. *Id.* at 1249.

Even though the government did not charge Respardo-Ramirez for possession of cocaine with intent to distribute it, the grand jury charged him for joining a conspiracy to distribute cocaine. Thus, we must affirm the firearm conviction if there is sufficient evidence from which a reasonable jury could find that the fake drug deal with Freeman furthered the drug conspiracy, and that Respardo-Ramirez had foreknowledge that his confederates would brandish guns.

We return to the record. Bravo-Garcia testified that Respardo-Ramirez had a gun in the garage in Chicago where the confederates questioned and held Victor and Enriquez-Enriquez. Bravo-Garcia also stated that Respardo-Ramirez was present during the planning meeting for the second trip to Detroit. While the group went to Detroit for the second time, Respardo-Ramirez guarded the kidnapping victim who remained in Chicago—an act that helped the people involved in the fake drug deal because none of them had to remain in Chicago to guard Victor. From this evidence we conclude that there was sufficient evidence to find that Respardo-Ramirez knew in advance that his accomplices had firearms that they would use to further the conspiracy to distribute cocaine.

Moreover, we hold that the evidence at trial was sufficient to establish that those who brandished the firearms did so to further the drug conspiracy. Enriquez-Enriquez and Victor's kidnapping and the heist of Freeman were all planned to further the broader conspiracy to sell cocaine in Chicago and Detroit. We must draw inferences in favor of the government, and therefore it is not unreasonable to conclude that Respardo-Ramirez knew that his friends had guns, that they intended to use cocaine to rob Freeman, and that the robbery related to the conspiracy. Thus, the district court did not err when it concluded that the evidence was sufficient to support a conviction on Count 7.

**H.  Sentencing Issue:  Second or Successive Convictions under § 924(c)**

Santana and Soto challenge their sentences.  They argue that the district court violated the Sixth Amendment when it imposed a mandatory twenty-five-year sentence to run consecutively with the other sentences without a jury finding that the convictions were second or successive.

### 1.  Standard of Review

We review de novo legal determinations about whether a prior offense triggers a mandatory minimum.  *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014).  When the defendant does not properly preserve the error, we review the district court's sentencing determination for plain error.  *Id.*  The government agrees that Soto properly preserved his challenge to the application of the mandatory minimum sentence.  Consequently, we will review Soto's challenge de novo.

With respect to Santana, however, the government disagrees about the proper standard of review.  "When determining whether a party has adequately preserved a claim for appeal, this court examines the record with an eye to the realities of the facts and circumstances of each sentencing proceeding."  *Davis*, 751 F.3d at 773 (internal quotation marks omitted).  In his sentencing memorandum, Santana did not raise a Sixth Amendment challenge to the imposition of a mandatory minimum on the basis that the jury did not find consecutive offenses.  But Santana's counsel raised his Sixth Amendment objection at the sentencing hearing.  And the district court considered and ruled on the objection.  Thus, Santana adequately preserved his Sixth Amendment challenge, and we review the district court's holding de novo.

### 2.  Jury Fact-Finding and the Sixth Amendment

Although the district court acknowledged that it is "fair to characterize what happened as a single course of conduct," it held that the evidence established two separate offenses on two different days.  R. 534 at 26 (Santana Sentencing Hr'g) (Page ID #3591); R. 549 at 19–20 (Soto Sentencing Hr'g) (Page ID #4138–39).  Santana and Soto argue that whether there were two distinct offenses or one course of conduct was a question for the jury—not a judge—to decide.  That judicial factfinding, they argue, violated the Sixth Amendment because the jury verdict forms do not establish whether either act was a second or subsequent offense.  The jury found

Soto and Santana guilty of Count 7, brandishing a firearm during and in relation to a drug trafficking crime, and Count 8, brandishing a firearm during and in relation to a crime of violence. Both counts reference the same firearms and the same date ranges, October 20–22, 2009. The counts differ in that Count 7 alleges that the defendants brandished the firearms in furtherance of two drug-trafficking crimes—the inchoate crime of conspiracy to possess with the intent to distribute cocaine, and the substantive crime of possession with intent to distribute cocaine, whereas Count 8 relates to a "crime of violence," namely the substantive offense of kidnapping and the inchoate crime of conspiracy to kidnap. *Compare* R. 413 at 6 (4th Superseding Indictment) (Page ID #1743), *with id.* at 7 (Page ID #1744). Thus, based on the indictment and verdict form alone, it is not clear that one § 924(c) offense is prior or subsequent to the other because the substantive offenses have overlapping dates,[21] and the inchoate offenses span a broad period of time, which includes the dates of the substantive offenses.[22] *See id.* at 1–6 (Page ID #1738–43).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. CONST. amend. VI. The right to an impartial jury trial combined with the Due Process Clause of the Fifth Amendment requires that the government prove "each element of a crime" to a jury "beyond a reasonable doubt." *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013). If a fact is "an 'element' or 'ingredient' of the charged offense," then a jury must find that fact beyond a reasonable doubt. *Id.* at 2158. "Facts that increase the mandatory minimum sentence are . . . elements and must be submitted to the jury and found beyond a reasonable doubt." *Id.* "It is impossible to dissociate the floor" and ceiling "of a sentencing range" from the ingredients of the charged offense. *Id.* at 2160. When a fact "alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." *Id.* at 2162. Juries need not find facts that influence a judge's discretion to sentence within the prescribed range. *See id.* at 2163. Soto's and Santana's claim turns on whether a

---

[21]The indictment alleges that Soto and Santana possessed with the intent to distribute more than 500 grams of cocaine "on or about October 22, 2009." R. 413 at 2 (4th Superseding Indictment) (Page ID #1739). The kidnapping is alleged to have occurred "on or about October 20–22, 2009." *Id.* at 5 (Page ID #1742).

[22]The drug-trafficking conspiracy allegedly began on or about November 26, 2008, and continued until the date of the indictment. R. 413 at 1 (4th Superseding Indictment) (Page ID #1738). The kidnapping conspiracy formed in October 2009 and ended on October 22, 2009. *Id.* at 4 (Page ID #1741).

finding that an offense is a second or subsequent § 924(c) conviction is an element of a charged offense that the government must prove beyond a reasonable doubt, or whether it is a fact that affects judicial discretion. Accordingly, we turn to the statutory text.

Section 924(c)(1) requires judges to impose various mandatory minimum sentences for using a deadly or dangerous weapon "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). The sentencing scheme begins with a five-year mandatory term of imprisonment, *id.* § 924(c)(1)(A)(i), and increases to seven years "if the firearm is brandished," *id.* § 924(c)(1)(A)(ii), and ten years "if the firearm is discharged." *Id.* § 924(c)(1)(A)(iii). However, "[i]n the case of a second or subsequent conviction under this subsection," then the judge must impose a sentence of not less than twenty-five years. *Id.* § 924(c)(1)(C)(i). In *Alleyne*, the Supreme Court held that, if a judge imposes the seven-year mandatory minimum sentence required for brandishing a weapon under § 924(c)(1)(A)(ii), then a jury must find beyond a reasonable doubt that the firearm was brandished. 133 S. Ct. at 2163. The logical extension of *Alleyne* strongly suggests that a jury must find whether a § 924(c) conviction is second or subsequent before the judge can increase the minimum sentence from five to twenty-five years.

It is not so simple. The Supreme Court left one exception to this general proposition: judges may find the fact that the defendant has a prior conviction. *Id.* at 2160 n.1 (citing *Almendarez-Torres v. United States*, 523 U.S. 224 (1998)). And a "prior conviction" includes a finding of guilt even "when a defendant is convicted of multiple offenses in the same proceeding." *United States v. Washington*, 714 F.3d 962, 970 (6th Cir. 2013) (citing *Deal v. United States*, 508 U.S. 129, 135–36 (1993)). Thus, a judge may find that the defendant has been convicted of a second or subsequent § 924(c) offense even when the convictions arise from the same trial and even though *Almendarez-Torres* "stand[s] on shifting sands." *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013).

Soto's and Santana's Sixth Amendment claim presents a different situation, however, because, unlike our prior cases, there was nothing in the indictment from which to determine the dates of the two offenses. In *Mack*, the defendant was charged with three carjackings and armed robberies on three different dates. *Id.* at 598. In *Davis*, we adhered to the holding of

*Almendarez-Torres*, but the terms of the prior judgments provided the temporal information necessary to find that the convictions were second and subsequent because we could identify the date of the offense from the judgment. *See* 751 F.3d at 774.

We do not need to decide whether this case presents an *Alleyne* issue, however, because any error was harmless. An error is harmless when "it is clear to us beyond a reasonable doubt that the outcome would not have been different even if the district court had instructed the jury on the element [in question] and required the jury to make a finding on that element." *Mack*, 729 F.3d at 608.

Soto and Santana argue that a jury could have found that Counts 7 and 8 were all part of the same course of conduct, namely the drug conspiracy. To determine whether § 924(c) offenses occurred on different occasions, we consider whether

> (1) it is possible to discern the point at which the first offense is completed, and the subsequent point at which the second offense begins; (2) it would have been possible for the offender to cease his criminal conduct after the first offense, and withdraw without committing the second offense; or (3) the offenses are committed in different residences or business locations.

*United States v. Paige*, 634 F.3d 871, 873 (6th Cir. 2011) (internal quotation marks omitted).

Based on our review of the record, we believe that it is clear beyond a reasonable doubt that the convictions on Count 7 and Count 8 were separate offenses. As for the two substantive offenses, we can identify the start and endpoint of each offense because the jury found Santana and Soto guilty of the substantive predicate offenses referenced in Counts 7 and 8: Count 2, possession of cocaine with the intent to distribute it; and Count 6, kidnapping. The kidnapping—the predicate offense for Count 8—occurred before the defendants possessed the cocaine. Santana and the others went to Detroit initially to question Enriquez-Enriquez about El Cartero's whereabouts. R. 490 at 56–71 (Trial Tr. Apr. 30, 2013) (Page ID #2749–64). The group hatched the plan to use the cocaine as a ruse to meet with Freeman only after kidnapping and questioning Enriquez-Enriquez. *See* R. 488 at 16–19 (Trial Tr. April 23, 2013) (Page ID #2460–63); R 490 at 86–89 (Trial Tr. Apr. 30, 2013) (Page ID #2779–82). And the evidence at trial established that the act of possessing the cocaine for the purpose of the fake meeting with Freeman was the factual basis for Count 7's predicate drug-trafficking offense. It is therefore

logically consistent that the jury found Soto and Santana guilty of the two firearms offenses linked with the two predicate substantive offenses, which the evidence established occurred on two different days.

It is also possible, of course, that the jury's verdicts with respect to Counts 7 and 8 were based on the two inchoate predicate offenses charged in Counts 1 and 5; however, that does not make the alleged *Alleyne* error harmful. The jury found Soto and Santana guilty of both inchoate offenses, as well. But it is clear beyond a reasonable doubt that the inchoate offenses were separate. We can identify the beginning and the end of each offense. The conspiracy to kidnap began sometime in October 2009 and ended on October 22, 2009. R. 413 at 4 (4th Superseding Indictment) (Page ID #1741). In contrast the drug conspiracy began "on or about November 26, 2008, and continu[ed] to on or about the date of [the] Indictment," April 2, 2013. *Id.* at 1, 11 (Page ID #1738, 1748). It was possible for Soto and Santana to join the drug conspiracy and not the kidnapping conspiracy, or vice versa. And the evidence definitively established that there were two incidents of brandishing, each of which occurred on a different day and in a different location.

Finally, even if, for example, the jury based the conviction for Count 7 by using the drug conspiracy as the predicate offense, and the conviction for Count 8 by using the substantive kidnapping offense, any alleged error was harmless beyond a reasonable doubt. Each substantive and inchoate crime required proof of different facts. And offenses are separate § 924(c) convictions even if they occur close in time or as part of one overarching scheme if the offenses require proof of different facts. *See United States v. Graham*, 275 F.3d 490, 520 (6th Cir. 2001). Because each listed predicate offense required proof of different facts and the evidence overwhelmingly established that there were two separate incidents of brandishing, any alleged *Alleyne* error was harmless.

## III. CONCLUSION

For the reasons explained in this opinion, we **AFFIRM** the district court's judgments.