RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BERNARD EDMOND (14-2426); FRANK HARPER (14-2427); PHILLIP HARPER (14-2428),

*Defendants-Appellants.*

⎱ Nos. 14-2426/2427/2428

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20188—George C. Steeh, District Judge.

Argued: January 28, 2016

Decided and Filed: March 3, 2016

Before: NORRIS, BATCHELDER, and SUTTON, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Sanford A. Schulman, Detroit, Michigan, for Appellant in 14-2426. Daniel V. Bradley, JONES DAY, Chicago, Illinois, for Appellant in 14-2427. Robyn B. Frankel, Huntington Woods, Michigan, for Appellant in 14-2428. Jerome Gorgon, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Sanford A. Schulman, Detroit, Michigan, for Appellant in 14-2426. Daniel V. Bradley, Morgan R. Hirst, JONES DAY, Chicago, Illinois, for Appellant in 14-2427. Robyn B. Frankel, Huntington Woods, Michigan, for Appellant in 14-2428. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

1

_____

**OPINION**

_____

SUTTON, Circuit Judge.  A jury convicted Frank Harper, Phillip Harper, and Bernard Edmond of violating an assortment of criminal laws arising from a conspiracy to carjack expensive cars and sell them.  Each defendant raises a bevy of challenges to his convictions and sentence.  Seeing no merit to any of these challenges, we affirm.

I.

The carjacking scheme lasted from late 2010 to early 2011.  In a typical case, one of the Harpers would threaten a parking lot valet with a gun while other cohorts would take the keys from a few high-end cars and drive them away.  The carjackers delivered the vehicles to intermediaries who took them to Edmond.  Edmond fabricated new titles for the vehicles, altered the appearance of the vehicles, and sold them.  All told, there were five carjackings (involving twelve cars) and one attempted carjacking.

The police eventually tracked down the three men, and a grand jury indicted them for violating several laws.  After an eleven day joint trial, the jury convicted them of multiple carjacking offenses:  Phillip of four carjackings plus one attempt, Frank of three carjackings, and Edmond of three carjackings and one attempt.  *See* 18 U.S.C. § 2119(1).  The jury separately convicted the three men of conspiring to commit the carjackings.  *See id.* § 371.  Because the men used firearms in each offense, the jury also convicted them of numerous counts of using a firearm during a crime of violence.  *See id.* § 924(c).  The jury also found Edmond guilty of operating a chop shop and of various crimes related to creating false identification numbers for motor vehicles.  *See id.* §§ 511, 2312, 2321, 2322.

The trio did not get off lightly.  The district court sentenced the men to extensive prison terms:  93 years (or so) for Phillip, 63 years (or so) for Frank, and 75 years for Edmond.

Each of them appealed, sometimes raising the same challenges, sometimes separate ones.

II.

All three men raise sufficiency-of-the-evidence challenges.  In reviewing these challenges, we examine "the evidence in the light most favorable to the prosecution," asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

*A.  Frank and Phillip's carjackings and attendant firearms convictions.*  Frank and Phillip claim that the government failed to introduce sufficient evidence to sustain their carjacking convictions and their firearms convictions.  As for the carjacking convictions under § 2119(1), the statute covers individuals who, "with the intent to cause death or serious bodily harm take[] a motor vehicle . . . from the person or presence of another by force and violence or by intimidation."  As for the firearms convictions under § 924(c), the statute requires that, "during and in relation to" the carjacking, the defendant "use[d] or carrie[d] a firearm" or "possess[ed] a firearm" "in furtherance" of the carjacking.

1.  The first carjacking and related firearms convictions.  The evidence showed that, around midnight on October 14, 2010, Phillip and three cohorts stole four cars from a valet parking lot.  Phillip admitted the theft to an FBI agent.  In his confession, introduced without objection at trial, he acknowledged that (1) both of his associates carried weapons, (2) one of his associates held a weapon at a parking attendant's back during the carjacking, and (3) Phillip and his associates grabbed several sets of keys and drove off with multiple cars.  The intent element of the carjacking offense is satisfied at a minimum if "a defendant brandishes a firearm and . . . physically touches the carjacking victim." *United States v. Washington*, 714 F.3d 962, 968 (6th Cir. 2013).  Another witness testified that Phillip carried a loaded gun.  All of this suffices to support the carjacking and firearms convictions.

2.  The second carjacking and related firearms convictions.  On January 25, 2011, Frank stole a Mercedes-Benz.  The victim testified that the carjackers pointed a gun at his face and demanded that he hand over his keys.  "Pointing a gun at a person while demanding conformity with particular action clearly implies a victim will be killed or injured if [he] refuses to comply," permitting the jury to find the requisite intent for the carjacking. *United States v. Mack*, 729 F.3d

594, 604 (6th Cir. 2013). And because Frank provided the weapon that his cohort pointed at the victim during the carjacking, that evidence suffices to uphold the § 924(c) firearms conviction.

3. The third carjacking and related firearms convictions. On January 31, 2011, Frank and Phillip stole three cars from another valet service. Phillip carried a gun. He stood talking to the valet for around five minutes while holding the gun, although the valet could not see the gun at all times. Meanwhile, his cohorts stole the vehicles from the lot. In addition to showing that Phillip stood with the valet brandishing a gun on and off for five minutes, the government showed that the gun was likely loaded, providing circumstantial evidence of intent, *see Mack*, 729 F.3d at 603–04; *see also United States v. Mack*, 808 F.3d 1074, 1080 (6th Cir. 2015). As for the firearms convictions, plenty of evidence showed advance knowledge that a gun would be used: One brother brought a loaded firearm to the carjacking and by then Frank and Phillip had developed a pattern of committing armed carjackings. "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate," the Supreme Court has recently explained, "the jury can permissibly infer from his failure to object or withdraw that he had such knowledge." *Rosemond v. United States*, 134 S. Ct. 1240, 1249–50 & n.9 (2014).

4. The fourth carjacking and related firearms convictions. On February 22, 2011, Frank, Phillip, and some cohorts stole three cars from still another valet service. Phillip held the attendant at gunpoint, asking him where the car keys were. After they located the keys, the men drove off with the vehicles. Like the first carjacking, this conviction stands because Phillip not only brandished a firearm but also touched the attendant with it. *Washington*, 714 F.3d at 968. Phillip's conspicuous use of the firearm, on these facts and given the brothers' developed pattern of carjacking, suffices to uphold both of their § 924(c) convictions.

5. The fifth (attempted) carjacking and related firearms convictions. On March 12, 2011, Phillip attempted, but failed, to steal a Porsche from a valet service. The valet wrestled the keys away from Phillip but not before Phillip "reach[ed] for" a firearm that was loaded. R. 166 at 78. This conviction holds up because, "[i]f a defendant brandishes a firearm and . . . there is direct proof that the firearm was loaded, § 2119's specific intent element will be satisfied." *Washington*, 714 F.3d at 968.

There is one wrinkle with this conviction.  The jury did not convict Phillip of the related § 924(c) firearms count, prompting Phillip to protest that the jury must not have believed that he brought a firearm to the attempted carjacking and thus should not have convicted him of carjacking.  That is not necessarily the case.  Even if Phillip did not bring a firearm to this carjacking, the jury reasonably could have viewed Phillip's physical fight with the valet as indicative of "intent to cause death or serious bodily harm."  18 U.S.C. § 2119; *see United States v. Fekete*, 535 F.3d 471, 480 (6th Cir. 2008).

6.  The sixth carjacking and related firearms convictions.  On March 20, 2011, Phillip helped steal one more car.  An attendant testified that the carjacker "pulled a gun" on him and ran over another attendant while speeding away in the pilfered car.  R. 165 at 90.  That evidence suffices to convict Phillip of carjacking and the attendant firearms crime given that he admits he was present for all aspects of the carjacking.

*B.  Edmond's convictions.*  Edmond raises sufficiency challenges of his own.  As with his co-conspirators, the shared objects of their conspiracy lead to shared convictions.

1.  The conspiracy and carjacking convictions.  The jury convicted Edmond of one count of conspiring to commit carjackings, three carjackings through a co-conspirator theory of liability, and one attempted carjacking, also through a co-conspirator theory.  To prove the conspiracy charge, the government had to show:  "(1) that the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the defendant voluntarily became a member of the conspiracy; (3) that one of the conspirators knowingly committed an overt act; and (4) that the overt act was knowingly done in furtherance of the conspiracy." *United States v. McGahee*, 257 F.3d 520, 530 (6th Cir. 2001).

The evidence met these requirements.  As to the first two elements, the defendants intentionally formed a conspiracy, and Edmond willfully participated in it through an assortment of acts.  He bought and sold cars carjacked by the Harpers and their cohorts.  He falsified titles and vehicle identification numbers and paid others to do so.  He knew that the cars had been carjacked.  And he paid more for stolen vehicles that included the keys, a premium that encouraged carjackings, as opposed to less dangerous forms of vehicle theft.  Obtaining the keys

often means taking them physically from a person, as most individuals do not lightly part with the keys to expensive pieces of property.

As to the third and fourth elements, Edmond's co-conspirators knowingly committed the overt acts (carjackings and an attempted carjacking), and they did so to further the ends of the conspiracy. The same evidence that supports the brothers' carjacking convictions supports these elements. Faced with considerable evidence of Edmond's pivotal role in the conspiracy, the jury had good reason to find that the carjackings were "reasonably foresee[able]" results of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 648 (1946).

Edmond protests that he never participated in any such conspiracy. That is wishful thinking on the law and the facts. "[A] tacit or mutual understanding among the parties is sufficient to show a conspiratorial agreement," *United States v. Bavers*, 787 F.2d 1022, 1026 (6th Cir. 1985)—and abundant evidence alluded to above shows just that.

2. The firearms convictions. Consistent with *United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994), the district court instructed the jury that it could convict Edmond of the § 924(c) violations under a co-conspirator theory of liability. The question for the jury was this: Was the use of a firearm in connection with the carjackings reasonably foreseeable? *See United States v. Myers*, 102 F.3d 227, 237 (6th Cir. 1996). Ample evidence showed that it was. Edmond understood how the carjackings were carried out, and he created a market for cars with keys, the theft of which often requires the use of violence or firearms. Successful carjackings turn on threats, which, to succeed, turn on the possibility that the threat can be acted on.

What's more, Edmond admitted that "he knew about [the carjackings]" and that he "paid somebody to . . . tell somebody to get some cars." R. 167 at 144. True, Edmond protested that he "didn't know that they were going to [get the cars] the way . . . they were doing it." *Id.* But Edmond's actions told a different story: He continued to engage in buying, converting, and selling carjacked cars even after becoming aware of the violent nature of the carjackings. On this record, the jury readily could find that Edmond reasonably foresaw that the carjackings would be committed with the aid of firearms.

Even if that is true, Edmond points out, the jury instructions offered two paths to conviction: *Pinkerton* co-conspirator liability *or* aiding and abetting liability. That is a problem, he says, because the district court did not correctly state the advance-knowledge requirement for aiding and abetting. *See Rosemond*, 134 S. Ct. at 1249–51. Any such mistake would not alter the conviction. As Edmond concedes, his argument faces plain error review because he did not raise the point below. Given the abundant evidence that would permit the jury to convict on the *Pinkerton* co-conspirator theory, any error in the aiding and abetting instructions did not prejudice him and thus did not affect his substantial rights. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). In the aftermath of *Rosemond*, several circuits have addressed this situation—where the judge gave a correct *Pinkerton* instruction and a faulty aiding and abetting instruction—and each one upheld the convictions so long as the *Pinkerton* theory supported them. *See United States v. Young*, 561 F. App'x 85, 92 (2d Cir. 2014); *United States v. Stubbs*, 578 F. App'x 114, 118 n.6 (3d Cir. 2014); *United States v. Saunders*, 605 F. App'x 285, 288–89 (5th Cir. 2015) (per curiam); *United States v. Rodriguez*, 591 F. App'x 897, 904–05 (11th Cir. 2015) (per curiam); *see also Musacchio v. United States*, 136 S. Ct. 709, 715–16 (2016).

3. Interstate transportation of stolen motor vehicles. Edmond challenges his conviction for transporting a stolen motor vehicle between States. *See* 18 U.S.C. § 2312. To convict, the jury had to find that Edmond (or someone he was aiding and abetting) "transported the motor vehicle in interstate commerce" and knew it was stolen. *United States v. Bishop*, 434 F.2d 1284, 1287 (6th Cir. 1970). The evidence supports this conviction: (1) The car was stolen in Detroit; (2) Edmond and a cohort traveled from Michigan to Toledo, Ohio, where they used a stolen Michigan title to obtain a clean Ohio title; and (3) the car was sold to an Ohio resident.

III.

Edmond and the Harpers raise several pretrial, trial-related, and constitutional claims. None has merit.

*A. Grand jury challenge.* Edmond argues that the district court should have granted his post-trial motion to dismiss his indictment because the prosecutor presented false testimony to the grand jury. Raised for the first time after trial, this motion was untimely, *see* Fed. R. Crim.

P. 12(b)(3)(A)(v), and Edmond did not show the district court cause to excuse that untimeliness, *id.* 12(c)(3).   Even had Edmond raised the argument when he should have, any prosecutorial misconduct before the *grand* jury was necessarily harmless given Edmond's subsequent conviction by the *petit* jury.  *United States v. Brown*, 332 F.3d 363, 375 (6th Cir. 2003); Fed. R. Crim. P. 52(a).

  *B. Handwriting expert.*  Edmond claims that the district court abused its discretion when it rejected his request to obtain a handwriting expert.   Invoking 18 U.S.C. § 3006A(e)(1), Edmond asked for a court-appointed handwriting expert to "cross-examine [government witness Justin Bowman] as it relates to his out of court identification of the defendant purportedly by examining a Michigan Drivers License photo that the Government maintains is the defendant and bears his signature." R. 248 at 4.  This license, he argued, "had someone else's photograph and bore his forged signature." *Id.* at 1.

  A defendant may obtain a court-appointed handwriting expert if "(1) such services are necessary to mount a plausible defense, and (2) without such authorization, [his] case would be prejudiced." *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002).  The court did not abuse its discretion in denying the motion, because Edmond did not meet either condition.  As for the first one, Edmond did not need the services of a handwriting expert.   After the government agreed to *Edmond's request* not to use the driver's license at trial, any need to analyze the license's signature disappeared.  Edmond objects that, if Bowman had made "an erroneous out of court identification," that fact "would [have] be[en] helpful to the trier of fact." Edmond's Br. 24.  But Edmond fails to show how this fact was "necessary to mount a plausible defense." *Gilmore*, 282 F.3d at 406.  As for the second condition, no prejudice arose.  Bowman had no problem identifying Edmond in court, and he testified that he had "seen" him regularly. R. 168 at 43.  The defense did not raise any misidentification arguments at trial.

  *C. Jury challenge.*  Edmond and Phillip Harper claim that the district court violated their rights under the Jury Selection and Service Act (28 U.S.C. §§ 1861–1869) and the Sixth Amendment because the jury pool did not include a cross-section of Detroit residents and African Americans.

As for the statutory claims, the duo filed their challenges under the Jury Selection and Service Act late. The Act requires challenges to the jury pool to be raised "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered" the grounds for the challenge, whichever is earlier. 28 U.S.C. § 1867(a). Neither Edmond nor Phillip challenged the jury pool before trial. Although two defense attorneys mentioned the lack of Detroit residents during jury selection, neither of them asked the court to do anything about it. And no one said a word about a shortage of African American representation on the jury. Edmond and Phillip did not challenge the jury pool until their motion for a new trial. Because they could have discovered any possible problems with the jury pool before trial, they missed the deadline for filing these claims. *United States v. Ovalle*, 136 F.3d 1092, 1098–1100 (6th Cir. 1998). Even if the district court had the power to excuse compliance with the seven-day requirement (an issue we need not resolve today), Edmond and Phillip gave the district court no explanation for doing so, foreclosing any right to review here. *See id.*; *United States v. Tarnowski*, 583 F.2d 903, 904 n.1 (6th Cir. 1978).

As for the constitutional challenges, the two men face a related, but not identical, problem. Criminal Rule 12(b) requires defendants to raise constitutional challenges to a jury's composition before trial. *See* Fed. R. Crim. P. 12(b)(3); *see also Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 362–63 (1963); *Ovalle*, 136 F.3d at 1107. If defendants fail to do so, they must show cause, Fed. R. Crim. P. 12(c)(3), which "often requires developing and analyzing facts" to assess whether the defendant can justify the late filing, *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015), and prejudice, *Davis v. United States*, 411 U.S. 233, 244–45 (1973). We review a district court's refusal to find cause and prejudice to excuse an untimely challenge for abuse of discretion. *Soto*, 794 F.3d at 655.

As with their statutory challenge, Edmond and Phillip first raised a constitutional jury pool challenge in their motion for a new trial. The district court denied the challenge, noting that Edmond and Phillip did not show cause for raising the point after trial. Because we agree that Edmond and Phillip have failed to show (or for that matter even argue) cause and prejudice, the district court did not abuse its discretion in rejecting this post-trial motion.

To the extent Edmond and Phillip raise new constitutional arguments on appeal about the jury pool's composition, plain error review applies. *Soto*, 794 F.3d at 655; *see United States v. Olano*, 507 U.S. 725, 732–35 (1993). Before the 2014 amendment to Criminal Rule 12, some courts took the view that the term "waiver" in the prior rule meant that a failure to raise a covered argument before the district court meant that plain error review was not available under Criminal Rule 52. As *Soto* explains, the 2014 amendment to Criminal Rule 12 removed the term "waiver" and left no foothold for prohibiting plain error review of Rule 12 arguments raised for the first time on appeal. *See* 794 F.3d at 648–55. So far as we can tell, all of the courts of appeals' holdings on this point agree that the amended Rule 12 allows appellate review of such arguments. *See United States v. Soto*, 799 F.3d 68, 86–88 & n.10 (1st Cir. 2015); *United States v. Daniels*, 803 F.3d 335, 352 (7th Cir. 2015); *United States v. Anderson*, 783 F.3d 727, 740–41 (8th Cir. 2015); *United States v. Sperrazza*, 804 F.3d 1113, 1118–19, 1126 (11th Cir. 2015); *United States v. Burroughs*, 810 F.3d 833, 838 (D.C. Cir. 2016).

That leaves one other issue that *Soto* resolved but over which disagreement lingers. What is the standard of appellate review for claims raised for the first time in the courts of appeals? Is it plain error or good cause? *Soto* ably explains why plain error review is the correct standard, especially in light of the district-court-centric nature of Criminal Rule 12 and the 2014 amendment to it. Not all courts of appeals have agreed. At this point, some have concluded that plain error review applies. *See Soto*, 794 F.3d at 652–55; *Sperrazza*, 804 F.3d at 1118–19, 1126. Some have applied good cause review alone. *See Anderson*, 783 F.3d at 740–41. Some have decisions pointing in both directions. *Compare Daniels*, 803 F.3d at 352, *and United States v. McMillian*, 786 F.3d 630, 636 & n.4 (7th Cir. 2015), *with United States v. Acox*, 595 F.3d 729, 731–32 (7th Cir. 2010). And some have noted the division of authority without taking a stand on it. *See Burroughs*, 810 F.3d at 838; *see also United States v. Soto*, 799 F.3d 68, 86 & n.10 (1st Cir. 2015); *United States v. Ibarra-Diaz*, 805 F.3d 908, 931 & n.13 (10th Cir. 2015).

We of course adhere to our court's well-reasoned approach in *Soto*, but it is worth offering two practical observations about this division of authority. The first is that the difference between the two standards is not apt to drive case outcomes frequently. Keep in mind that the "good cause" standard requires the defendant to establish cause *and* prejudice. *Davis*,

411 U.S. at 243–45. The different standards will lead to different outcomes only in those cases where the defendant can show cause for the error and prejudice from it but, through it all, not plain error. That is not likely to be a large set of cases.

The second point narrows the set of affected defendants further, perhaps indeed to nil. The most likely explanation for failing to raise a Criminal Rule 12 objection until appeal will be ineffective assistance of counsel, which implicates an analogous cause and prejudice standard. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Criminal Rule 12 now requires only that the party raise a defense or objection before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Given that requirement, it is difficult to think of too many overlooked defenses and objections covered by the Rule that will not involve ineffective assistance. That will leave appellate courts in familiar territory—addressing a claim for plain error review in the direct criminal appeal (giving the defendant one chance to right the wrong) and knowing full well that an ineffective assistance claim under the cause and prejudice standard later may be in the offing (giving the defendant a second chance to right the wrong). For the same reason that appellate courts often insist that the facts and circumstances surrounding a cause-and-prejudice argument under *Strickland* be developed initially in the district court, it makes sense to do the same for a cause-and-prejudice argument related to a Criminal Rule 12 failure.

With this digression behind us, we can turn to whether the defendants have shown plain error. They have not. Indeed, no error, let alone a plain one, occurred. To show a cognizable violation of the Sixth Amendment, Edmond and Phillip initially had to establish "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires . . . is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Edmond and Phillip fall short in each respect. They did not show that citizens of Detroit are a distinct racial, religious, or other cognizable group. They did not show that representation of African Americans or residents of Detroit is unfair or unreasonable in jury pools in general. And they

did not show that any underrepresentation stemmed from systematic exclusion.  Given this shell of a jury pool claim, their challenge necessarily fails.

*D. Admission of evidence about another shooting.*  Frank claims that the district court went astray when it admitted this evidence.  At trial, Stratford Newton, a government witness indicted as a co-conspirator, testified that in December 2010 he picked up Frank in a carjacked vehicle and drove the vehicle as Frank fired shots into a neighboring car with a gun that was used at various carjackings throughout the conspiracy.  The government did not charge Frank with this offense, but it did warn him before trial that it planned to introduce the incident as intrinsic acts evidence.  *See United States v. Churn*, 800 F.3d 768, 778–79 (6th Cir. 2015).  Over Frank's objection, the district court admitted the evidence because it was "intertwine[d] with the conspiracy" and would "tend to demonstrate that . . . [Frank] was in possession of the same gun and car that was used to commit some of the other carjackings."  R. 242 at 27.

A district court may admit uncharged background evidence as long as it is "inextricably intertwined" with the underlying offense.  *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).  This theory of admission goes by many, maybe too many, names:  *res gestae*, background evidence, intrinsic acts, intrinsic evidence.  *See Churn*, 800 F.3d at 779.  No matter the name (we prefer "intrinsic acts"), the idea is the same:  Intrinsic acts "are part of a single criminal episode," *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995), meaning they "ha[ve] a causal, temporal or spatial connection with the charged offense," *Hardy*, 228 F.3d at 748.  Courts may admit evidence via this route if it (1) "is a prelude to the charged offense"; (2) "is directly probative of the charged offense"; (3) "arises from the same events as the charged offense"; (4) "forms an integral part of a witness's testimony"; or (5) "completes the story of the charged offense."  *Id.*

The district court did not abuse its discretion in admitting the evidence.  Although the shooting did not arise in the context of a carjacking, it still "ha[d] a causal, temporal or spatial connection with the charged offense[s]."  *Id.*  Frank was riding in a vehicle that had itself recently been carjacked and was used in the commission of a carjacking.  He fired a weapon that a co-conspirator would use later that day to carjack a vehicle, and the incident occurred the day after one carjacking and the day before another.  The shooting was a prelude to, directly

probative of, and developed the story of the carjacking conspiracy. *See id*. Nor is it fair to say that the evidence was admitted for prohibited "propensity" reasons. *See United States v. Gomez,* 763 F.3d 845, 855–56 (7th Cir. 2014) (en banc).

The district court also had a good reason for denying any Evidence Rule 403 objection to the evidence. The incident was highly probative. It established the relationship between Frank and Newton (who was part of the conspiracy), and it tied Frank to the weapon used to commit a number of carjackings. Nor was it unduly prejudicial. The testimony covered just four pages of the trial transcript in an eleven day trial and the jury already had heard considerable unchallenged evidence about Frank's involvement in other violent incidents, including the carjackings themselves. And as just shown, the government offered legitimate grounds for admitting the evidence. *See id.* at 856–57.

Frank insists that the December 2010 shooting was not intertwined with his involvement in the conspiracy because the first overt act in his indictment did not occur until January 25, 2011, nearly a month after the shooting. But Frank was also charged with participating in the carjacking conspiracy, which began in January 2009. Evidence about Frank's involvement with carjacked cars, friendship with co-conspirator Newton, and use of this particular weapon thus had a "causal, temporal [and] spatial connection" to the conspiracy. *See Hardy*, 228 F.3d at 748.

Frank adds that the shooting was not *inextricably* intertwined with the charged crimes and that it was not *necessary* to the government's story. But Frank gives these terms a construction our caselaw cannot bear. Intrinsic acts may be admitted when evidence "provides background information, establishes a nexus between individuals, or completes the story of the charged offense." *United States v. Gibbs*, 797 F.3d 416, 424 (6th Cir. 2015). The December 2010 shooting does all of that and then some.

*E.    Prosecutorial misconduct.* Frank argues that the government presented false testimony at trial when it called FBI Agent Alan Southard, who had investigated Frank's case. During his investigation, Southard prepared a large number of pretrial reports about information that he anticipated might become testimony at trial. Frank argues that Southard's testimony at trial contradicted statements in these reports.

One problem with this argument is that Frank did not raise it below.  At trial, Frank raised only a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), arguing that the government improperly refused to disclose evidence about changes in Southard's pretrial reports until the middle of trial.  Frank's appellate counsel abandoned that argument, and now tries to transform it into a knowing-presentation-of-false-testimony claim.  The metamorphosis fails.  A suppression-of-the-evidence claim under *Brady* and a knowing-presentation-of-false-testimony claim require different showings.  *See Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009).  Frank did not raise this argument below; plain error review applies.  *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

There was no error to start.  To show knowing presentation of false testimony, a defendant must prove that the statements the government elicited were "actually false."  *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).  We do not permit a defendant to point only to "mere inconsistencies in testimony by government witnesses" because these "do not establish knowing use of false testimony."  *Id.*  That is all Frank does, however.  He argues that (1) Southard, sitting at trial and hearing testimony from government witness Stratford Newton, realized there were discrepancies between Newton's statements at trial and the statements he had previously made to Southard (memorialized in Southard's pretrial reports), and (2) to rehabilitate Newton, Southard decided to lie on the stand, saying that some statements in his pretrial reports were incorrect.  But these "bare allegations" do not show that the government "knowing[ly] present[ed] [] false testimony."  *See United States v. Fields*, 763 F.3d 443, 463 (6th Cir. 2014).

Southard's inconsistencies also have reasonable explanations.  He may have misheard some statements while preparing his pretrial reports, and he might have realized some of his mistakes only much later while preparing for trial.  With nothing more than speculation, Frank fails to carry his burden of proof to show that Southard perjured himself.  *See Lochmondy*, 890 F.2d at 822.

What's more, the (supposedly) false testimony did not affect Frank's substantial rights.  There is no "reasonable probability," *United States v. Marcus*, 560 U.S. 258, 262 (2010), that Southard's statements led to a faulty conviction.  Defense counsel had a full opportunity to cross-examine Southard at trial about the difference between his pretrial reports and his testimony at

trial, questioning his motives and trying to undermine his credibility.  And to some extent they did so.  The alleged inconsistencies thus were laid bare to the jury.  That too suffices to withstand plain error review.

Frank makes a separate prosecutorial-misconduct argument, claiming that the government modified another witness's statement "mid-trial in a way that substantially impaired Frank Harper's ability to support his defense."  Frank's Br. 51.  This argument too was not raised below, and it too does not satisfy the requisites of plain error.  Frank does not offer a single citation to the record to support his claim, and it is not our job to perform the task for him by searching high and low through the record.  The claim fails.

*F.  Use of a* Pinkerton *conspiracy instruction.*  The court instructed the jury that it could use a *Pinkerton* co-conspirator theory of liability to convict on the § 924(c) firearms charges.  Phillip argues that the Supreme Court's decision in *Rosemond v. United States*, 134 S. Ct. 1240 (2014), an *aiding and abetting* case, changed the requirements for finding a *conspiracy* under *Pinkerton*.  He maintains that *Rosemond* created "new, and more stringent, rules for co-conspirator liability."  *United States v. Adams*, 789 F.3d 713, 714 (7th Cir. 2015).  But "that's not what . . . *Rosemond* . . . held."  *Id.*

*Rosemond* dealt with the aiding and abetting theory of liability for § 924(c), not with the *Pinkerton* co-conspirator theory of liability.  The two theories are distinct, and we allow the use of either theory to reach a § 924(c) conviction.  *See Napier v. United States*, 159 F.3d 956, 960 (6th Cir. 1998).  *Rosemond* aiding and abetting liability requires, in part, "intent [to] facilitat[e] the offense's commission" and "advance knowledge" that a firearm will be used to commit the offense.  *Rosemond*, 134 S. Ct. at 1245, 1251.  *Pinkerton* conspiracy liability does not have the intent or knowledge requirements; once a person has joined the conspiracy, *Pinkerton* requires only reasonable foreseeability of the crimes committed by co-conspirators.  *See United States v. Swiney*, 203 F.3d 397, 401–02 (6th Cir. 2000).  *Rosemond* did not alter the *Pinkerton* framework, as at least one circuit has already concluded.  *See Adams*, 789 F.3d at 714.

Phillip raises a second challenge to the *Pinkerton* instruction, claiming it violated his Fifth Amendment grand jury guarantee by constructively amending the indictment.  He claims

that his indictment charged him only with *committing* § 924(c) crimes and did not charge him with *conspiracy* to commit them. But we have rejected this argument before, holding that "a district court may properly provide a *Pinkerton* instruction regarding a substantive offense, even when the defendant is not charged with the offense of conspiracy" with respect to that specific offense. *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2007).

G. *Double jeopardy challenge.* Edmond claims that his conviction for operating a chop shop violated the Double Jeopardy Clause because Michigan had already convicted him of a similar violation under state law. But the Double Jeopardy Clause bars only successive prosecutions by a single sovereign, federal or State. *Heath v. Alabama*, 474 U.S. 82, 88–89 (1985).

IV.

Edmond and Phillip also challenge their sentences. In calculating each sentence, the district court first imposed mandatory sentences for their firearms convictions under § 924(c): 55 years for Edmond and 80 years for Phillip. It then determined the guidelines-recommended sentences for their other convictions and did not lower their ultimate guidelines-related sentences to account for their mandatory sentences. Edmond and Phillip claim that the court abused its discretion when it refused to consider the length of their mandatory firearms sentences when calculating their guidelines sentences, which led to a 75-year sentence for Edmond and a roughly 93-year sentence for Phillip.

*United States v. Franklin*, 499 F.3d 578 (6th Cir. 2007), governs. It establishes that, when considering convictions under § 924(c) along with other counts, "[t]he sentencing court must determine an appropriate sentence for the underlying crimes without consideration of the § 924(c) sentence." *Id.* at 586. Nor does it matter that the district court's rationale for considering the mandatory and guidelines sentences separately was a faulty one. The district court reasoned that separate consideration was appropriate because it was possible that the mandatory sentences could be "affected by some future action by Congress or by the Court of Appeals." R. 233 at 25. While *Franklin* was the only explanation the district court needed, it

reached the right outcome anyway.  Getting to the right place via the wrong road is not reversible error.

For these reasons, we affirm.